2008-NMCA-037

179 P.3d 579

**J.R. HALE CONTRACTING CO., INC.,**
Plaintiff–Appellant/Cross–
Appellee,

v.

**UNION PACIFIC RAILROAD, a Delaware
corporation, and K.B. Alexander Co. of
Texas, Inc., a Texas corporation, Defen-
dants–Appellees/Cross–Appellants.**

No. 26,422.

Court of Appeals of New Mexico.

Sept. 12, 2007.

Calvert Menicucci, P.C., Sean R. Calvert, Albuquerque, NM, for Appellant.

Atkinson & Thal, P.C., John S. Thal, Elizabeth Losee, Albuquerque, NM, for Appellees.

## OPINION

SUTIN, Chief Judge.

{1} Subcontractor J.R. Hale Contracting Co., Inc. (Hale) sued to enforce a lien claim for labor and materials against owner Union Pacific Railroad (Union Pacific), claiming breach of contract against general contractor K.B. Alexander Co. of Texas, Inc. (Alexander), and also claiming a right to recover in quantum meruit against Union Pacific and Alexander (Defendants). The dispute centered on Hale's claim for the amounts alleged due for subballast required for a railroad-related construction project. Defendants sought partial summary judgment on three grounds: that Hale released its claims, that Hale's alleged loss was caused by its own mistake in estimating the amount of subballast required for the project, and that Hale could not successfully assert a quantum meruit claim. Defendants also filed a motion to recover attorney fees and costs. Hale, too, moved for partial summary judgment, seeking withheld retainage, as well as an interest penalty and attorney fees under the Retainage Act, NMSA 1978, §§ 57–28–1 to –11 (2001, as amended through 2007) (currently known as the Prompt Payment Act).

{2} The district court granted Defendants' motions for summary judgment dismissing Hale's contract and quantum meruit claims, and awarded Alexander attorney fees, but limited costs. The court awarded Hale the withheld retainage amount, and, related to this award, also awarded Hale an interest penalty and attorney fees. Hale appeals, as do Defendants by way of cross-appeal. We reverse the court's summary judgment dismissing Hale's contract claim. Reversal of the dismissal of the contract claim requires us also to reverse the rulings which involved the award of attorney fees and costs to De-

fendants, as well as the dismissal of the quantum meruit claim that may have to be reevaluated after Hale's contract claim is revisited. We remand the foregoing issues and also remand the issues of attorney fees and costs to Hale and the cut-off date for the running of the Retainage Act interest penalty for further consideration consistent with this opinion. We hold that the court did not err in ruling that Alexander violated the Retainage Act.

## BACKGROUND

### I. Chronology of Material Circumstances

{3} In July 2002, Union Pacific sent out requests for bids in relation to construction of a project involving a parking lot facility to be used in connection with unloading vehicles from trains. After receiving Union Pacific's request for bids, Alexander obtained Hale's bid for placement of subballast consisting "of a foundation course for asphalt surface course or railroad ballast." This bid was based on estimated quantities of subballast bid on a contract unit price basis and not on a fixed price basis. Subballast required for the project, after excavation of existing soil, was divided into five separate depths of 24″, 12″, 16″, 22″, and 3″. For example, as to the 12″ component, which is at issue in this case, the unit price in Hale's bid was $5.11 a square yard, and the Hale and Alexander bids were based on installation of 4,392 square yards of material.

{4} Alexander's bid resulted in a contract in August 2002 between Union Pacific and Alexander. Alexander and Hale then entered into a Subcontract Agreement (the subcontract) in September 2002. The subcontract price was "a sum not to exceed ... [$716,070.04]." Hale and Alexander agreed to subballast quantities in terms of a square yard (sy) unit of measurement and at specific unit prices, as follows: 21,083 sy of 24″ @ 9.48; 4,392 sy of 12″ @ 5.11; 2,985 sy of 16″ @ 6.90; 2,230 sy of 22″ @ 9.45; and 1,985 sy of 3″ @ 1.37. Hale certified "that the unit prices ... are the unit prices for which we will perform the work required to complete the referenced job in accordance with the plans and specifications included in the bidding documents."

{5} In estimating prices for its bid to provide subballast, Hale had to take into consideration the fact that it would be purchasing the subballast from a supplier on a price per ton basis. Thus, in order for Hale to estimate and bid a specific square yard unit price for each of the five depths at a certain compaction ratio, it had to mathematically determine the amount of subballast, in tons, that would be required for the project to fill the area at the various depths. At some point, when or just after Hale began its work, Hale discovered that it miscalculated its unit prices for subballast in its bid through an error in converting the contractual square yard quantities of subballast into tons of material to be purchased from its supplier.

{6} Work began on the project in September 2002 and, according to Hale, soon thereafter it became apparent that the original plans on which bids were requested and received did not sufficiently take into account the nature of hydrologic soil problems that existed in the area. Hale informed Alexander in writing on October 18, 2002, that the unstable soil conditions required additional subballast material to "be paid for separately." In turn, on the same day, Alexander informed Union Pacific of the "problems with the sub-grades." Further soil testing and analysis were then performed by Amarillo Testing and Engineering, Inc. (Amarillo), which provided a report and recommendation to Union Pacific on October 21, 2002. Amarillo recommended additional base course material.

{7} October 22, 2002, produced considerable activity. Attaching Amarillo's report and recommendation with respect to the problematic soil conditions, Alexander responded to Hale in a faxed communication in which Alexander stated that it had the same concerns as those expressed by Hale. The response read:

> I received your letter and have the same concerns. I have attached the testing labs recommendation that came this morning. I am waiting on direction from [Union Pacific] on weather [sic] they want to proceed based on those recommendations. They will be on site this Thursday. Since

your billings are based on quantity placed, there shouldn't be a problem if the total amount goes up some. Just make sure you include delivery tickets as backup with your invoices. Call if you have any questions.

Referring to the Amarillo report as calling for "two feet of base ... to bridge unstable ground," Union Pacific directed Alexander to proceed according to the Amarillo testing comment. Alexander then sent the foregoing Union Pacific communication to Hale, stating to Hale that Union Pacific had "given us the go-ahead to proceed based on the recommendation from Amarillo Testing." In addition, Alexander stated, "As I mentioned in the earlier fax, we need to make sure to keep the delivery tickets for the ballast material placed at the site for billing purposes. I am aware that there will most likely be some overages."

{8} Three days later, on October 25, 2002, Hale emailed Alexander indicating concerns about pipe bedding and backfill based on perceptions about Union Pacific's " 'we will deal with it when it comes up' attitude," and stating that "[t]he Subballast will overrun because [for] all fills the [Union Pacific] people want us to use subballast in lieu of dirt." In a return email within one hour's time, Alexander notified Hale of a decision by Union Pacific to revise "the quantities that reflect the changes to the ballast material and the excavation," to be reflected in a change order showing that Union Pacific removed 4,681 cubic yards of excavation and added 9,000 square yards of 12″ subballast. Alexander also informed Hale that Hale's "total add for this will be $18,231.67," and further indicated that "I think the subballast will still go over that because of the soft spots[,] so just make sure to send your delivery tickets with your invoices."

{9} As shown in an exhibit to Hale's application for payment number 2 (application no. 2), by November 19, 2002, Hale had furnished, placed, and compacted 18,000 of 21,083 square yards of 24″ subballast called for by the subcontract, or 85% of the total required. In early December 2002, Hale and Alexander signed a change order, designated change order number 3 (change order no. 3)

that changed the original 4,392 square yards of 12″ subballast in the original bid and subcontract to 13,392 square yards, a 9,000 square yard increase at the $5.11 price. This change order no. 3 also reflected an additional $18,231.67 to be added to the original subcontract amount of $716,070.04, which, along with previous change order amounts, brought Hale's total subcontract with change orders to $740,174.21.

{10} On December 27, 2002, Hale submitted its application for payment number 3 (application no. 3) for the period ending December 20, 2002, confirming a total revised subcontract amount of $740,174.21. An exhibit to this application showed that Hale had furnished, placed, and compacted 3,083 square yards of 24″ subballast, 13,392 square yards of 12″ subballast, 2,985 square yards of 16″ subballast, and 2,230 square yards of 22″ subballast. These figures reflect and the exhibit shows that as of December 20, 2002, Hale had furnished, placed, and compacted 100% of the 16″, 22″, and 24″ subballast called for in the subcontract. In regard to the 12″ subballast, the exhibit reflects the original contract amount of 4,392 square yards and shows the 13,392 square yards that had been furnished, placed, and compacted, which indicates placement of the 9,000 square yards added by change order no. 3 and results in a 305% completion rate. The exhibit shows the same unit prices as those upon which the parties agreed at the bid and contract stages including, with respect to the 12″ subballast, the unit price of $5.11. Requesting $207,200.35 in connection with application no. 3, Hale agreed in the application that, upon payment, it released all claims with respect to work performed through the date of the application. As we discuss later in this opinion, Alexander did not respond to Hale's application no. 3 until on or about February 4, 2003, more than a month after it was submitted.

{11} Hale completed its work in January 2003. On January 28, 2003, Hale wrote to Alexander stating:

When we commenced construction on the above referenced project[,] it became evident that the unit bid prices for the subballast items were estimated in error.

However, we were obligated to fulfill the contract despite the problem and proceeded with construction as planned. Later, some issues arose with the subgrade and part of the solution required an anticipated over-run in the sub-ballast. At such time, we requested that any over-run amount in the sub-ballast item be re-negotiated, so that the extent of the unit bid price deficiency would not cause further losses than originally anticipated.

In this letter, Hale analyzed the quantities of subballast called for under the subcontract by converting square yards to tons. By Hale's calculation, the square yard quantities for all of the subballast converted to 33,814.57 tons; however, the tons actually hauled amounted to 45,493.95, resulting in an over-run of 11,679.38 tons of subballast. Hale requested payment at a rate of $20.00 per ton for the over-run that exceeded that in the subcontract.

{12} On February 3, 2003, Hale submitted its application for payment number 4 (application no. 4), for the period ending January 17, 2003. This application again confirmed a total revised contract amount of $740,174.21. On an exhibit to this application, Hale showed that it had furnished, placed, and compacted 1,985 square yards of 3″ subballast. Hale also showed "(9,000.00)" square yards of 12″ subballast, together with a new line item called "Subballast Over Run," showing a "Contracted Quantity" of 11,679.38 at a unit price of $20.00, totaling an invoice amount of $233,587.60, figures that conform to the over-run calculation contained in Hale's January 28, 2003, letter to Alexander.

{13} On February 4, 2003, one day following Hale's application no. 4, Hale signed a release of all claims based on receipt of Alexander's payment to Hale for $165,265.11 on Hale's application no. 3. The $165,265.11 check stub reflected a revised contract and contract completion amount of $740,174.21, less retainage of $74,017.42, and an amount previously paid of $500,891.68. The stub also showed a net due amount of $165,265.11. The arithmetic shows that $500,891.68, plus $165,265.11, plus $74,017.42, totals $740,174.21, which was the revised contract amount.

{14} Unrelated to the 12″ subballast, on February 11, 2003, Alexander issued a further change order, designated number 7 (change order no. 7), in favor of Hale in the sum of $76,022.50. Payment of the change order no. 7 amount brought the total subcontract price to $816,196.71.

{15} On March 10, 2003, Hale filed a claim of lien "[f]or a value of $211,511.69 plus retainage of $97,518.72 for a total value of $309,030.41, plus interest of [18%] per annum, all of which remains unpaid, and furnished the first of labor, service and material on 11/15/02 and the last of labor, service and material on 01/07/03." Hale filed the present action in April 2004, seeking enforcement of its claim of lien. Hale claimed breach of contract for Alexander's failure to pay $336,397.76 for labor and material, plus interest, attorney fees, and costs, and also sought recovery against Defendants in the same amount in quantum meruit.

## II. The Summary Judgment Motions and Rulings

{16} Defendants filed three motions for partial summary judgment. The first motion asserted that Hale released all claims for payments and lien rights for labor and materials through December 20, 2002, and was required to indemnify Defendants and hold them harmless from the claims Hale had asserted in its complaint. This motion was based on the release in application no. 3 and the February 4, 2003, release that Hale signed in consideration for payment of $165,265.11 on Hale's application no. 3. Defendants asserted that the releases unambiguously released all mechanic's lien rights and all other claims for payment arising out of Hale's labor or material as of December 20, 2002, specifically including all of the 12″ subballast placed. Defendants also relied on indemnity language contained in the February 4, 2003, release.

{17} Defendants' second motion sought to limit Hale's recovery to $74,249.22, being the final retainage amount remaining unpaid because Hale would not sign a release for the money. Defendants also asserted that Alexander paid Hale for all subballast as of December 20, 2002, at the agreed upon subcon-

tract price, and that Hale could not recover more funds simply because it realized its own estimating mistake. Defendants' third motion sought judgment on Hale's quantum meruit claim on the grounds that Hale could not obtain a personal judgment against Union Pacific, as owner of the project, where Hale's contract was with Alexander and not with Union Pacific, and that Hale had no claim for unjust enrichment because Union Pacific paid Alexander substantially all amounts that Union Pacific owed Alexander on their contract.

{18} The district court entertained oral argument on Defendants' three motions for summary judgment. Following the argument of counsel, the court indicated that it thought that it had before it all of the evidence that it would hear in a trial and suggested two alternatives: (1) the court decide the issues on summary judgment, or (2) the parties stipulate that the evidence before the court was the evidence that the court would hear at trial and submit proposed findings of fact and conclusions of law. In making this proposal, the court reasoned that a summary judgment could be reversed, which would send the parties back for trial, "just running up more legal fees and everything to go up and then come back down again." The court explained:

> I've heard all of the evidence, and based on the evidence that I'd heard J.R. Hale just made a mistake and all the evidence indicates that they're just going to have to eat that mistake. So I truthfully think it's wiser as I finished all this stuff early this morning, going through this, it seems to me that the wise thing to do would be just to make all of this a part of the Record, which if, in fact, you're going to take it up on appeal, this would be the Record that would go up; they would have all of this, anything else and we would have requested findings, conclusions of law that would protect everybody, then I'd go ahead and do a decision and actually if you're going to take it up, go ahead and take it up on a decision and a judgment, rather than on a granting of a partial summary judgment.

The court indicated that it was ruling in Defendants' favor based on "the law, as I read it and the facts as I see it in this case," whether the issues were decided on the motions or decided after a trial based on the record already before the court and whatever the parties wanted to add to the record at trial. The court ended this discussion saying:

> Basically if I read all of the evidence that I'm going to hear in a trial in this case, there's no sense in reading it and then hearing it all over again because it's going to be the same.
>
> So that's why I'm throwing all this out because I'm in a position where I think one of these—I'll be happy to go either one of these two ways, then you all can decide which is going to be [the] best way for all of you to go.

The record does not reflect whether all the parties agreed to proceed with partial summary judgment, or whether they disagreed and the court therefore proceeded with partial summary judgment.

{19} The court thereafter determined in a written order that as to Defendants' three motions for partial summary judgment, no genuine issue of material fact existed and Defendants were entitled to judgment as a matter of law. With respect to the first motion, the court ordered that Hale's contract claim and claim of lien were barred as a matter of law by virtue of Hale's execution of the release in application no. 3 and the February 4, 2003, release. The court also ordered that the February 4, 2003, release and the subcontract required Hale to indemnify Alexander for its attorney fees and costs incurred in the action. With respect to the second motion, the court ordered that Hale's recovery was limited to $74,249, which the court characterized as the "final payment" due under the subcontract. The court reserved jurisdiction to determine whether Hale was entitled to recover prejudgment interest under the Retainage Act in connection with the recovery. With respect to the third motion, the court determined without any explanation that Hale's quantum meruit claim against Defendants failed as a matter of law.

{20} Hale then filed a motion for partial summary judgment, seeking judgment

against Defendants for an interest penalty and attorney fees under the Retainage Act. After hearing this motion, the court entered a final judgment in regard to all motions. The court entered judgment against Hale on Defendants' three motions, effectively dismissing Hale's claims, and including an award in favor of Alexander and against Hale for attorney fees and costs in the amount of $79,470. The court also awarded judgment in favor of Hale, and against Alexander, for $74.249.22, which was the final amount (retainage) due under the subcontract; for $2,593.79, representing a Retainage Act interest penalty; and for $13,000 in attorney fees awarded pursuant to the Retainage Act.

## III. The Releases

{21} Defendants rely on the release in Hale's application no. 3 and on the February 4, 2003, release signed upon payment by Alexander of Hale's application no. 3. The district court held that these releases were effective to bar Hale's claims for the subballast for which it claims it was not paid. The pertinent release language in application no. 3 is:

> Subcontractor hereby releases all mechanic's lien rights, McGregor Act bond claims, Miller Act bond claims, equitable liens, and all other claims for payment arising out of labor, material, equipment, subcontract work, services, delays, extra work and/or changes, related to the Subcontractor work at the project unless specifically listed below. Upon payment of the Subcontractor's application for payment, this instrument shall constitute a full release of all rights, claims and demands through the date of this application, except as listed below[.]

The pertinent language in the February 4, 2003, release is:

> This instrument shall constitute a partial release of all rights, claims and demands of the undersigned against the Contractor arising out of or pertaining to the above referenced project. If partial, all rights and claims of the project are leased [sic] up to and including the 20th day of December[ ] 2002.

## IV. Certain Subcontract Provisions

{22} We set out here the subcontract provisions discussed by the parties in connection with some of their arguments. Article I, Paragraph 1.01, entitled Subcontract Work, states, in part, that "[o]nly written change orders issued by contractor[']s project manager will be considered for payment." Article II, entitled Performance and Prosecution of Work, states the following in Paragraph 2.03:

> *Surface and Subsurface Conditions.* The Subcontractor shall inspect surface and/or subsurface conditions affecting Subcontractor's Work to assure that Work will be properly installed in accordance with Contract Documents. If any remedial work is required to the surface or subsurface, Subcontractor shall immediately notify Contractor in writing. SUBCONTRACTOR ACCEPTS ALL SURFACE AND SUBSURFACE CONDITIONS WHEN SUBCONTRACTOR INITIATES HIS WORK WITHOUT SUCH NOTICE, AND WAIVES ANY CLAIMS FOR EXTRA COMPENSATION FOR REPAIR OR REMEDY TO THE SURFACE OR SUBSURFACE OR FOR REPLACEMENT OF THE SUBCONTRACT WORK ARISING OR RESULTING FROM DEFECTS IN THE SURFACE OR SUBSURFACE.

{23} Article IV, entitled Price, Payments, states in Paragraph 4.01: *"Subcontract Price.* Contractor agrees to pay to Subcontractor a sum not to exceed [$716,070.04] for performance of the Subcontract Work pursuant to the terms of this Agreement, subject to adjustments for changes pursuant to Article V, Changes." Article V, entitled Changes, then states in Paragraphs 5.01 and 5.02 the following:

> 5.01 *Changes.* The Subcontractor may be ordered by the Contractor, without invalidating this Agreement, to make changes in the Subcontract Work within the general scope of this Agreement consisting of additions, deletions or other revisions to the Subcontract Work. Subcontractor, prior to the commencement of such changed or revised work, shall promptly submit to the Contractor any

claim for adjustment to the Subcontract Price or Project Schedule because of such changed or revised work. All Change Orders, Modifications, Claims for Adjustments, and Notices provided in this Agreement shall be in writing.

5.02 *Notice Required.* SUBCONTRACTOR SHALL NOT BE ENTITLED TO ANY EXTRA COMPENSATION OR ADDITIONAL PERFORMANCE TIME FOR ANY CHANGED, REVISED, OR EXTRA WORK UNLESS THE SUBCONTRACTOR HAS GIVEN THE CONTRACTOR WRITTEN NOTICE OF A CLAIM FOR EXTRA COMPENSATION AND/OR PERFORMANCE TIME PRIOR TO BEGINNING THE WORK FOR WHICH THE CLAIM IS MADE AND HAS RECEIVED APPROVAL FOR SAID CLAIM IN WRITING FROM THE OFFCE [sic] OF THE CONTRACTOR; OTHERWISE, SUCH CLAIM SHALL BE WAIVED. Subcontractor shall not perform any changed, revised, or extra work unless prior to the performance of such work, either: (i) the Contractor and Subcontractor enter into a modification changing the Subcontract Price and/or schedules; or (ii) the Contractor, after receiving the Subcontractor's claim, provides the Subcontractor notice to proceed with the changed, revised, or extra work absent such modification.

{24} Defendants rely on Article I to argue in opposition to Hale's appeal that only written change orders could be considered for payment, that written change orders were paid, and that no written change order existed relating to Hale's claims. Similarly, Defendants also rely on Article II to assert that the burden was on Hale to inspect soil conditions. Hale relies on Articles II, IV, and V, contending that the additional work constituted remedial work under Article II as to which Hale gave immediate notice in writing, and an adjustment for changes pursuant to Article V ordered by Alexander pursuant to which Hale promptly submitted a written claim for adjustment to the subcontract price.

## V. Hale's Points on Appeal

{25} Hale's first four points relate to the district court's grant of partial summary judgment to Defendants based on the court's view of the release contained in application no. 3 and the February 4, 2003, release. These arguments are based on Hale's view that the subballast for which it seeks compensation from Defendants was "additional work" not included, nor intended by the parties to be included, in the subcontract square yardage and dollar amount allocations for subballast and therefore not included in the coverage of the releases. The first of these arguments is that, at the time of the releases, the parties were aware of the claims for additional work, which were unliquidated, and that the claims that were the subject of the releases were liquidated contract obligations. The second is that the releases were not supported by consideration, where they were made in return for payments required to be made by contract and no payment was made on the outstanding claims for additional work. The third is that the parties did not intend to release claims for the additional work. The fourth follows from the third and claims that the parties' prior conduct reflected an intent to perform and pay for additional work notwithstanding execution of the releases. Hale argues that, throughout the project, the parties directed work to be performed and the parties tracked field and delivery tickets with the understanding that after the work was completed, a change order would be issued to incorporate the additional work and payment would be issued for the work.

{26} Hale's fifth point is that the court ignored the factual dispute between the parties as to whether Defendants had relied on the releases. Hale's argument is based on its denial of Defendants' statement of undisputed fact that Alexander had relied on the releases, and on Hale's denial of the statement of undisputed fact that Alexander invoiced Union Pacific for the 12″ subballast on December 23, 2002, and provided a lien release to Union Pacific in reliance on the releases. Hale asserts that, in the district court, it provided evidence showing that Alexander could not have relied on the releas-

es. Hale's sixth point claims error in enforcing the indemnification clause in the February 4, 2003, release and argues that NMSA 1978, § 56–7–1 (1971) (amended 2003 and 2005), bars enforcement of the clause because Alexander, the indemnitee, seeks indemnification based on Alexander's own positive acts in not making payment to Hale, the indemnitor. Hale's seventh point is that it is entitled to recover in quantum meruit because Union Pacific did not pay Hale or Alexander for the additional subballast material provided by Hale. Hale's eighth point claims that the court erred in determining that the Retainage Act interest penalty for withholding retainage without depositing the retained funds in an escrow account should only be imposed through March 7, 2003, the date Hale filed its lien claim.

## DISCUSSION

{27} "All reasonable inferences from the record should be made in favor of the non-moving party[,]" with respect to a motion for summary judgment. *Juneau v. Intel Corp.*, 2006–NMSC–002, ¶ 8, 139 N.M. 12, 127 P.3d 548. We view the facts in a light most favorable to the party opposing the motion and we draw all reasonable inferences in support of a trial on the merits. *Spencer v. Health Force, Inc.*, 2005–NMSC–002, ¶ 7, 137 N.M. 64, 107 P.3d 504. "[S]ummary judgment is not an appropriate vehicle for courts" to weigh the evidence and judge the credibility of the witnesses. *Juneau*, 2006–NMSC–002, ¶ 27, 139 N.M. 12, 127 P.3d 548.

Summary judgment is inappropriate where there are genuine issues of material fact. We construe reasonable doubts as to the existence of a genuine factual dispute in the nonmovant's favor. Summary judgment is an extreme remedy that should be imposed with caution. If there is the slightest doubt as to the existence of material factual issues, summary judgment should be denied.

*McNeill v. Rice Eng'g & Operating Inc.*, 2006–NMCA–015, ¶ 38, 139 N.M. 48, 128 P.3d 476 (internal quotation marks and citations omitted). We review summary judgment de novo. *Juneau*, 2006–NMSC–002, ¶ 8, 139 N.M. 12, 127 P.3d 548.

{28} Because the parties treated the evidence before the court as complete for the purposes of deciding the issues, we are free to address the questions of clarity and ambiguity of the releases. As we discuss in more detail later in this opinion, we conclude that the releases that the district court held barred Hale's contract claim were sufficiently ambiguous to require a determination by the finder of fact as to whether the releases covered Hale's claimed additional work. Because we are reversing the district court's grant of summary judgment on Hale's contract claim and remanding the issues surrounding the meaning of, intent behind, and effect of the releases for trial, we also reverse and remand other issues that may have to be reevaluated by the court depending on the outcome of the release issues. Those other issues include the monetary extent, if any, of Hale's obligation to indemnify Alexander; the monetary extent, if any, of Alexander's obligation to pay attorney fees to Hale; and whether Hale can pursue its quantum meruit claim. Apart from any aftermath from the trial relating to the release issues, we remand the issue of the Retainage Act interest penalty cut-off date for clarification by the district court of the appropriate cut-off date of the penalty which Hale is entitled to recover from Alexander. As the finder of fact is the district court, the court must try the issue and enter findings of fact and conclusions of law to support its determination in regard to the meaning, intent, and coverage of the releases, and with regard to any further matters that may also have to be tried by the court. We affirm the district court's ruling limiting Defendants' cost recovery. The foregoing summary of our holdings leads us at this point into a discussion of the issues to which our holdings relate.

## I. Hale's Contract Claim for Additional Work

{29} We first discuss Hale's view of its claim for additional work, next Defendants' views, then the picture that emerges from the facts and arguments, and we close explaining why the circumstances require us to reverse and remand.

584

## A. A Summary of Hale's Views

{30} Hale's arguments center on its contentions that it provided a quantity of subballast not specified in the subcontract documents and a quantity that was required by Union Pacific to be placed by Hale in order to reach a particular ground level and that was to be paid for based on presentation of delivery tickets evidencing placement of the material. We will attempt a summary of Hale's arguments.

{31} Starting early in the process, Hale points to a geotechnical report accompanying Union Pacific's request for bids indicating that because of the generally poor quality of soil and a shallow water table, the existing grade would have to be raised by a minimum of two feet of imported engineered fill, a recommendation Hale says was not followed by Union Pacific in its request for bids. Hale asserts that Union Pacific was aware of the need for more material as a result of soil conditions after its bids went out and at the start of the project. Hale points out that it gave written notice to Alexander of likely over-runs of subballast required for the project because of the soil conditions, and that Alexander acknowledged the problem in writing. Defendants then directed Hale to place all subballast actually needed for the project, which included subballast that was required in addition to the additional 9,000 square yards in change order no. 3. Alexander acknowledged that there "will most likely be overages," and directed Hale to keep and submit delivery tickets showing the amount of subballast placed. To Hale, this all evidenced Defendants' knowledge that there would be more subballast required than the additional 9,000 square yards which would be accounted for in a subsequent change order, and their knowledge and intent that application no. 3 was not meant to cover the additional subballast needed to satisfy fill requirements, since it was not known how much material would ultimately be needed to complete the project.

{32} Hale explains that what was covered in application no. 3 and intended by the releases was only the work as reflected in the subcontract and change order no. 3, a liquidated and undisputed amount. The antici-pated over-run, Hale argues, consisted of work the amount of which was unliquidated, to be separately compensated based on separate delivery tickets and not intended to be covered in application no. 3 or the releases. Furthermore, Hale argues, under these circumstances, there was no consideration for any release of the unliquidated, outstanding claims. *See Ratzlaff v. Seven Bar Flying Serv., Inc.,* 98 N.M. 159, 164, 646 P.2d 586, 591 (Ct.App.1982) (stating that "payment of a liquidated, undisputed, matured obligation will not constitute consideration for a release of further obligations").

{33} As additional support on its point that the releases were not intended to cover all work performed as of December 20, 2002, Hale looks to the parties' course of conduct. An important circumstance on which Hale relies is change order no. 7. Hale shows that Alexander asked Hale to perform additional (not 12″ subballast) work outside the contract and to keep track of that additional work with delivery tickets reflecting the amount of work performed. Hale did the work and provided tickets showing work beginning on October 2, 2002, with continuing work that ended in January 2003. Hale also shows that Alexander did not issue a change order before that work was commenced, and that Hale performed the work and submitted the delivery tickets as directed by Alexander. On February 11, 2003, several days after the February 4, 2003, release, Alexander issued change order no. 7 for pre-December 20, 2002, work—work that could have been determined by Alexander to have been covered by the February 4, 2003, release, just as Alexander determined that Hale's additional subballast was covered by that release.

{34} Thus, Hale argues that the sequence of events with regard to the additional subballast work was almost identical to the delivery ticket work incorporated into change order no. 7. That is, the entire course of communications beginning October 18, 2002, and ending on October 25, 2002, regarding the problem with the subballast, together with the acknowledgment that there would be an over-run even with an additional 9,000 square yards of subballast, and with Hale being directed to send its delivery tickets

with its invoices in regard to the subballast, was a course of conduct virtually identical to the additional work later covered in change order no. 7. Hale explains as follows:

In both cases[,] K.B. Alexander directed J.R. Hale to perform additional work without providing a change order for the work prior to its commencing. In both cases, K.B. Alexander directed J.R. Hale to keep tickets reflecting the additional work performed, which J.R. Hale did, and to turn in the tickets at the conclusion of the work so that a change order could be issued. In both cases[,] the additional work continued between October[ ] 2002 and January[ ] 2003, both before and after the December 21, 2002 payment application. The only difference between the two is that for the additional subballast K.B. Alexander refused to issue a change order and asserted that all claims for additional compensation had been released, while on the field ticket work K.B. Alexander ignored the releases and issued Change Order number 7.

This, Hale contends, showed a course of conduct by which Alexander would pay for pre-December 20, 2002, work, knowing that the February 4, 2003, release was not intended to cover the additional work.

{35} Additionally, Hale argues, Defendants' practices were to withhold 10% from each payment application. Each application included release language. Before receiving payment, Union Pacific would require Alexander, and Alexander would require Hale, to sign a release. Yet, Hale argues, notwithstanding the releases, the retained funds were to be held until completion of the project. This circumstance too, Hale contends, showed a course of conduct indicating that the releases were not intended to be strictly read.

{36} Further circumstances, Hale argues, are that Union Pacific's specifications for the project called for payment to be made during the course of the work based on estimates of the amount of the work performed, but that no estimate, except a particular final estimate, was to be construed as final or conclusive against Union Pacific with respect to the amount of work or compensation. Hale argues that specifications provided, with re-spect to measurement and payment for subballast, that payment for the work was to be made not off of the original bid estimate, but instead based on the actual measured quantities placed during the course of the project, and that payment would occur after all work on the project had been completed. This argument comes, in part, from Hale's reading of two specifications for the project that were incorporated into its subcontract. Section 13 stated:

No estimate made under any of the provisions of this agreement (except the final estimate made upon the suspension of the Contractor's work under the Total Suspension of Work Section hereof) shall be construed or considered as final or conclusive against [Union Pacific] in respect to the amount of work done and/or materials furnished, compensation to be allowed therefor or payments made.

Part 4.1 of the supplemental specifications stated:

Placement of subballast shall be measured in cubic yards within the neat lines of the typical sections, line[s], grades and slopes established. Subballast shall be paid for at the contract unit price as placed according to the specifications including furnishing, unloading, hauling, compacting, dressing, testing and incidental work or equipment required.

{37} Hale admitted miscalculating its unit prices for subballast material in its bid to Alexander. Hale also admitted that it agreed to perform the originally estimated quantities of work as set forth in its bid and the subcontract. These admissions, however, according to Hale, did not defeat Hale's entitlement to be paid for the additional amounts of subballast that it supplied after providing written notice that additional material would be provided at additional cost and after Alexander acknowledged that there would be over-runs of material. Hale did not admit that the bid miscalculation related to the amount of material to be placed. In Hale's view, the dispute in the summary judgment proceeding related to the "amounts by which the total amount of subballast placed exceed[ed] the total amount of subballast originally estimated by Union Pacific."

{38} The foregoing circumstances compose Hale's view, including a course of conduct and practice, indicating an intent of the parties that the releases would not cover any claims for additional work or retainage which had not been paid. Under this point, Hale argues that the intention of the parties must govern in construing the releases, citing *Dinkle v. Denton*, 68 N.M. 108, 112, 359 P.2d 345, 347 (1961), and that in construing the releases in the present case, the court could hear evidence of the circumstances surrounding the making of the releases and any relevant course of conduct, citing *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). Later in this opinion, we discuss these and other cases in regard to interpretation of the releases.

{39} Finally, Hale argues that Defendants did not rely on the releases and that, absent reliance, Defendants cannot stand on the releases as a bar to Hale's claim.

## B. A Summary of Defendants' Views

{40} Defendants, of course, see things quite differently. In opposition to Hale's arguments relating to additional material, Defendants raise the subcontract requirement of a written change order, as well as the releases Hale signed, and the fact that Hale underbid the project and was saddled with the risk of loss. Defendants assert that Hale failed to furnish and that Alexander never signed off on daily work tickets or a follow-up formal change order for the "additional" subballast Hale claims was supplied. Defendants especially argue that they never agreed to renegotiate the amounts Hale claimed for additional material or over-run.

{41} Defendants argue with what Hale characterizes as "additional work" and contend that what Hale says was additional material or an over-run was never factually shown for the purposes of the summary judgment proceedings and this appeal. Defendants assert that the record indicates nothing more than 13,392 square yards of 12″ subballast was called for and was finally agreed upon and paid for, and, as far as the record is concerned, that is the amount that was placed by Hale. Thus, according to Defendants, Hale correctly released claims for all

12″ subballast placed by December 20, 2002. However, in Defendants' view, even were it arguable that an amount in excess of 13,392 square yards of 12″ subballast was placed, this would be irrelevant in view of the releases Hale signed. Defendants assert that relationships in major construction projects, such as the present project, must be based on standard contract documents showing agreed upon changes, payments, and releases including written change orders and releases of claims for work performed through a specific date, and not on unclear circumstances or claims.

## C. The Emerging Picture

{42} From the parties' arguments and documentary evidence, the following arguable picture of the circumstances emerges from the record. Hale looks in substantial part to what took place in the early stages of the project. Whether or not based in part on its mistake in estimating its cost, Hale started a process early on, in October 2002, to protect itself by notifying Alexander of soil problems and the need for further material to "be paid for separately." Alexander acknowledged that need in statements that might reasonably lead the recipient, here Hale, to believe that it would be paid for the additional material. Union Pacific agreed to a change according to the "Amarillo testing comment" and called for changes in excavation and subballast square yardage, increasing the subballast from 4,392 to 13,392 square yards. Alexander acknowledged to Hale that there would still likely be some overages, and told Hale to make sure to keep its delivery tickets, as backup with its invoices, presumably showing the amount of material delivered. These communications were followed by change order no. 3 decreasing the amount of excavation and increasing the amount of 12″ subballast with a commensurate increase in the subcontract price.

{43} Material was placed to reach a required fill level that appears may not have been satisfied by the square yardage specified in the contract. Hale's application no. 3 and previous applications did not vary from the $5.11 unit price, nor did the subcontract price reflect in the applications extend be-

yond the original amount plus executed change orders. Hale accepted payments and signed releases, and, particularly, the February 4, 2003, release, without expressly contesting or questioning the consequences of the releases, and without assuring or otherwise making clear, in writing, the status of payment for what Hale considered to be placement of additional 12″ subballast in excess of the 13,392 square yards set out in the original subcontract and change order no. 3.

{44} As the record stands, it was not until Hale's January 28, 2003, letter and its February 3, 2003, application no. 4 that Hale began a process of attempting to be paid extra for additional material. Hale's January 28, 2003, letter referred to an earlier request "that any over-run amount in the sub-ballast item be re-negotiated, so that the extent of the unit bid price deficiency would not cause further losses than originally anticipated." However, Hale does not indicate in its briefs and it is otherwise unclear as to what the attempted renegotiation consisted of, when it took place, or who in particular engaged in such negotiation. Hale's January 28 letter and application no. 4 sought a $20.00 unit price for 11,679.38 tons of 12″ subballast over-run.

{45} From October 2002 through the end of January 2003, the parties appear not to have discussed the issue of payment for additional subballast in excess of the amounts designated in the subcontract and change order no. 3. Nothing indicates that the parties discussed whether Hale would get paid based on any tonnage calculation. From all appearances, Hale either assumed or otherwise worked on an expectation that it would ultimately get paid for the added material it claimed, and Defendants at some point determined that with respect to 12″ subballast Hale had placed, it would receive only what was agreed to in the subcontract and change order no. 3. The only further evidence we can rely on is the deposition testimony of the author of Hale's January 28, 2003, letter. In answer to a deposition question as to what caused him to write the letter, he stated that his recollection was that "our original attempts at getting the renegotiated price hadn't been followed through with. We

hadn't received a change order adjusting the contract."

{46} The following helps to clarify and also emphasizes the conflicting views on matters raised throughout the proceedings in the district court. Defendants see the subcontract as one in which Hale not only misjudged the amount of material necessary when it bid the subcontract, but also that Hale assumed the risk that material would seep into the soil and that more material than that paid for in the subcontract and change orders would be necessary. Hale distinguishes contract-prescribed depths of material from the amount of material actually needed to fill a required area when, because of the oversaturation of the soil, there was essentially a hole in the bottom through which material ran and was wasted. Hale does not accept that phenomenon as its risk to bear and asserts that it was to be paid based on all actual quantities placed and not on the subcontract quantities. Hale sees Union Pacific's pre-bid process knowledge and the October communications as an understanding of the practical concern that no one knew how much material would finally be necessary to fill the space and that the open soil issue would be taken care of by compensating Hale upon its presentation of delivery tickets showing the excess material delivered over what was in the subcontract and change orders, in order to accomplish the required fill. Further, it appears that Defendants see the subcontract as an agreement to perform the work for a fixed price, whereas Hale sees the subcontract as one based on Union Pacific's request that contractors bid the work on the basis of estimated quantities and on a unit, not on a fixed price, basis.

{47} In addition, Defendants read change order no. 3 and the releases to be the end of the discussion, essentially saying that any communications preceding them were merged into these documents. Hale, on the other hand, cites law and evidence to show that these documents merely documented the liquidated contractual measurements and price, and did not and were not intended to document the unliquidated additional material and cost necessary to fill the area required to be filled under the subcontract. Hale also

argues that the district court erroneously failed to consider the entire course of conduct shown in the record when construing the parties' intent with respect to what the releases covered.

## D. The Issues Require Remand

 {48} "[T]he primary rule of construction of releases is that the intention of the parties must govern, and they are to be construed by the same rules of arriving at the intention of the parties as any other kind of contracts." *Dinkle*, 68 N.M. at 112, 359 P.2d at 347 (internal quotation marks and citation omitted). The standard for determining the intent of parties is enunciated in *Mark V*, 114 N.M. at 781, 845 P.2d at 1235. That standard can apply to the interpretation of a release. *See Berlangieri v. Running Elk Corp.*, 2003–NMSC–024, ¶¶ 29–33, 134 N.M. 341, 76 P.3d 1098 (considering a liability release); *Hansen v. Ford Motor Co.*, 120 N.M. 203, 206–07, 900 P.2d 952, 955–56 (1995) (same). Presumably then, in determining the intended scope of a release, "the trial court could consider extrinsic evidence to determine whether the facially unambiguous terms of the release are in fact ambiguous." *Hansen*, 120 N.M. at 206, 900 P.2d at 955 (stating that this statement derives from *Mark V* and *C.R. Anthony*). Our Supreme Court abandoned the plain-meaning or four-corners standard in *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 817 P.2d 238 (1991). *See Mark V*, 114 N.M. at 781, 845 P.2d at 1235. This requires a court to go beyond the four corners and consider evidence outside the contract itself to explain the purposes or context of the contract, called "the contextual approach to contract interpretation, in recognition of the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding." *Id.* (internal quotation marks and citation omitted). *Mark V* states:

[W]e held in *C.R. Anthony* that even if the language of the contract appears to be clear and unambiguous, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance, in order to decide whether the meaning of a term or

expression contained in the agreement is actually unclear.

*Id.* at 781, 845 P.2d at 1235 (internal quotation marks and citation omitted). *Mark V* states the methodology in detail as follows.

The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear. If the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law. If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder[.]

Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact.... In order to determine the meaning of the ambiguous terms, the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent.

*Id.* at 781–82, 845 P.2d at 1235–36 (citations omitted).

{49} In *Schultz & Lindsay Constr. Co. v. State*, 83 N.M. 534, 494 P.2d 612 (1972), a construction contract action for amounts due for extra work, our Supreme Court stated the following with regard to intent.

The primary objective in construing a contract is to ascertain the intent of the parties.

It is logical to assume that the parties to a contract know best what is meant by its terms, and that whatever is done by them during the performance of the contract is consistent with their intent and the meaning of the contract terms as understood by them. Consequently, the construction of a contract adopted by the parties, as evi-

denced by their conduct and practices, is entitled to great weight, if not the controlling weight, in ascertaining their intention and their understanding of the contract. This is particularly true as to the resolution of ambiguities and uncertainties of meaning in the contract, and especially so if the conduct of the parties manifesting their construction of the contract occurred prior to the development of a controversy between them.

.... The applicable rule requires the construction of ambiguities and uncertainties in a contract most strongly against the party who drafted the contract.

*Id.* at 535–36, 494 P.2d at 613–14 (citations omitted).

**1. Preservation Question**

{50} In addressing Hale's arguments regarding intent as shown by a course of conduct, Defendants acknowledge that the extrinsic evidence "of the sort Hale now advances[ ] is ... admissible to aid in the interpretation of the parties' written contract if the Court determines that the contract is ambiguous or to show fraud, misrepresentation, or mistake." At the same time, Defendants point out that Hale had "never contended that the Subcontract, the Change Orders, the Applications for Payment, or the Releases are ambiguous or that they were procured by fraud." In a footnote, Defendants assert that any such argument could not be raised for the first time on appeal.

■ {51} It is true that Hale has not explicitly stated that the releases were ambiguous. However, in the face of Defendants' arguments that the releases plainly released Hale's claims, Hale clearly asserted a contrary intent and way to read the releases. Importantly, on this preservation question, in oral argument on the motions in district court, and particularly on the issue of what to look at when interpreting a release, Hale observed that a "release is just like any other contract" and that under *Mark V* and *C.R. Anthony*, "[t]he Courts of New Mexico no longer employ the Four Corners Doctrine." Hale followed this up by stating:

You were entitled to look at the party's [sic] actions in interpreting that release. Clearly the parties never intended those releases to cover retainage, never intended those releases to recover [sic] additional work as long as the claim was known. It was a full release as to work that had been applied for.

Hale cites *Mark V* and *C.R. Anthony* in its brief in chief on appeal for the proposition that "a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." *Mark V*, 114 N.M. at 781, 845 P.2d at 1235 (internal quotation marks and citation omitted). Hale's brief contains the following conclusions with regard to intent.

As reflected in the ... course of conduct of the parties and course of practice on this particular project, it was the intent of the parties that the releases be construed to release all claims for the work performed prior to the effective date of the release for which payment was made, and that they not release any claims for additional work or retainage which was not paid. The trial court erred in ignoring the parties' course of conduct and practice in enforcing the releases to bar J.R. Hale's claims for additional compensation.

. . . .

.... [T]he parties throughout the project directed work to be performed and tracked on field and delivery tickets with the understanding that after the work was completed, a change order would be issued to incorporate the additional work and payment would be issued therefor. The trial court erred by ignoring this prior conduct in interpreting and enforcing the releases to bar additional work performed by J.R. Hale and tracked by delivery tickets in accordance with the directions of K.B. Alexander and the practice of the parties.

Further, Hale states on appeal that it "raised issues as to [Defendants'] representations as to what was covered by the releases as well as whether [Alexander] had provided any consideration for the release of the claims for additional work. Both of these are factual

issues, which if found in favor of [Hale], would preclude enforcement of the releases."

{52} Contrary to Defendants' view, we believe that Hale adequately raised *Mark V* issues. It is manifestly apparent that the *Mark V* methodology should have been employed in the present case by the district court once Hale presented admissible evidence of the circumstances surrounding the October communications, change order no. 3, application no. 3, and the releases. It is manifestly apparent that the ultimate purpose of Hale's arguments in regard to intent as shown by extrinsic evidence, including course of conduct, was to engage the district court in a *Mark V* methodology to ascertain whether the releases, if not also the subcontract, were ambiguous, which would have created a genuine issue of material fact as to what the releases were intended to cover. Hale's obvious purpose was to show that neither the subcontract nor any release was intended to cover its unliquidated claim for additional work, arguable language in the releases, or the subcontract to the contrary. In our view, either the district court failed to engage in a *Mark V* analysis with respect to the releases, or did so and erred in concluding that the releases were not subject to different interpretations and were therefore ambiguous.

## 2. Merits

{53} What the district court was concerned about at the close of argument, with regard to reversing a summary judgment in this case, has come to pass. We think that, considering Hale's evidence, a *Mark V* analysis permits the conclusion that the releases were fairly and reasonably susceptible to two different constructions, thereby creating an ambiguity. The summary judgment in regard to enforcement of the releases must be reversed and remanded for further proceedings. In this fact- and issue-intensive case, the issue of interpretation of the releases was present and critical for Hale's defense against summary judgment on its claim for compensation for additional work. *Mark V* and *C.R. Anthony* were cited to the court. Hale asked the court to look beyond the four corners of the releases. Hale argued the written communications relating to the need

for additional material and a course of conduct commensurate with that shown relating to change order no. 7. The obvious issue was whether the evidence established different views as to the coverage intended by the releases.

{54} In *Farmington Police Officers Ass'n v. City of Farmington,* 2006–NMCA–077, ¶ 23, 139 N.M. 750, 137 P.3d 1204, we remanded to the district court to "hear evidence of the circumstances surrounding the making of the [contract] and of any relevant usage of trade, course of dealing, and course of performance." (Internal quotation marks and citation omitted.) Based on *C.R. Anthony* and *Restatement (Second) of Contracts* § 201 (1981), we stated:

> If, in the light of this evidence, no reasonable factfinder could determine what the [parties] knew or should have known of the other's understanding in any way but one, the district court may determine the parties' respective understandings as questions of law, and apply the standards of Restatement (Second) of Contracts § 201 accordingly. If, in the light of the extrinsic evidence, reasonable factfinders could disagree as to what the [parties] knew or should have known of the other's understanding, the district court should treat the parties' respective understandings of the [contract] as questions of fact, and apply the standards of Restatement (Second) of Contracts § 201 to the facts so found. The district court should remain alert to the possibility that each party's understanding was reasonable under all the circumstances existing when the [parties] entered into the [contract] and that there was a failure of mutual assent. We encourage the parties to request, and the district court to enter, findings of fact and conclusions of law consistent with the standards of Restatement (Second) of Contracts § 201.
>
> In the previous paragraph[,] we have assumed that the parties will come forward with extrinsic evidence bearing upon what the [parties] knew or should have known of the other's understanding. In the event the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to

conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation. We emphasize that traditional canons of contract construction are merely guides in the process of interpretation, and even when a court is construing a contract as a matter of law, it should remain alert to the possibility that a lack of clarity is an indication of a failure of mutual assent that cannot, and should not, be cured through strained or outcome-determinative application of judicial maxims.

*Farmington Police Officers Ass'n,* 2006–NMCA–077, ¶¶ 23–24, 139 N.M. 750, 137 P.3d 1204 (footnote omitted) (alteration omitted) (internal quotation marks and citations omitted). It is unnecessary for us to follow a similar procedure in the present case. Because of the manner in which the facts and issues were presented in the district court, we are permitted to engage in the *Mark V* analysis. Doing so, we determine that the totality of circumstances surrounding and including the problematic soil conditions, the October written communications regarding over-runs and separate billing, and the manner in which Alexander handled other work and payment, particularly change order no. 7 and retainage, all combine to show sufficient lack of clarity as to the coverage of the releases so as to create an issue for the factfinder. That issue is whether the releases cover the additional material Hale claims to have placed at the direction of Defendants. We reverse the court's summary judgment on Hale's contract claim and remand for further proceedings consistent with this opinion.

{55} As an adjunct to our holding, it is important to make something clear. Defendants rely heavily on an assertion that the district court "correctly applied [the] controlling principles of contract law to hold that Hale cannot avoid the subcontract requirement that any increase in compensation above the subcontract price must be in a written change order signed by both parties." We do not see in the record where the court held this, nor do Defendants show us where

in the record this holding appears. Defendants' motions for summary judgment did not specifically seek judgment based on a proposition that, as a matter of law, the failure of Hale to perform the additional work based on a written change order expressly covering that work barred Hale from asserting a claim for that additional work.

{56} It is apparent from argument on both sides that the subcontract in one section stated that only written change orders would be considered for payment, yet in another paragraph stated that extra compensation could be obtained if, prior to the additional work, the subcontractor gave written notice of a claim. Neither the arguments nor Defendants' motions alerted the district court to any position that, as a matter of law, Hale's claims were barred because no written change order existed for payment for the claimed additional work. It does not appear that the district court engaged in any analysis to determine whether subcontract provisions barred Hale's claims or even whether the subcontract was ambiguous. We therefore see no reasonable basis on which to attempt to uphold the court's summary judgment barring Hale's claims based on the ground that, as a matter of law, the lack of a written change order alone is sufficient to bar the claims.

{57} Along the same line, Defendants argue that it was undisputed that Hale did not perform any "additional" work that was not addressed by a written change order. Like their argument invoking the subcontract provisions, Defendants did not assert that they were entitled to judgment because, as a matter of law, all subballast placed at the project was included in written change orders. It appears to us that Hale submitted enough evidence to create a genuine issue of material fact as to whether it furnished subballast over the square yardage stated in the subcontract and in change order no. 3. For the same reasons, we are unpersuaded that Hale's estimating miscalculation was the basis on which the district court barred Hale's contract claim as a matter of law, and we are also unpersuaded that the issue could be decided without a trial on the merits of

whether the mistake was causally related to the over-run of subballast that Alexander later acknowledged would occur and that Hale claims did occur. That issue, it appears, was in dispute.

{58} What we draw from the circumstances is that neither party adequately communicated or carefully protected itself in regard to an anticipated subballast over-run due to unstable soil conditions. Union Pacific adjusted the subcontract measurements by decreasing excavation and adding subballast, and Hale was paid for the additional work specified. Yet, despite these adjustments, the parties did not, it appears, communicate on what was left hanging, namely, the apparent understanding, as expressed by Alexander, that the subballast would "still go over" the adjusted amount "because of the soft spots," and that Hale should "send [its] delivery tickets with [its] invoices." Further, Hale raises a question, not in our view satisfactorily explained by Alexander, as to why the process that took place as reflected in the work and payment evidenced in change order no. 7 was not intended to be followed in connection with any contemplated subballast over-run.

{59} Defendants recite cases that express a strong public policy of freedom of contract and correlative duty of a court to enforce contracts as written. We have no quarrel with these general principles. Defendants also warn against this Court deciding the issues in a way that will "create instability in business transactions and disregard commercial realities" or leave contractual obligations "dependent upon the whims of a panacean court or a jury." *United Props. Ltd. v. Walgreen Props., Inc.*, 2003-NMCA-140, ¶ 31, 134 N.M. 725, 82 P.3d 535 (internal quotation marks and citation omitted). We agree that appellate courts should be careful in these regards. What we do not agree with is that our determinations in the present case violate any policy of freedom of contract or duty to enforce contracts, or that they create any business instability beyond what the embedded *Mark V* methodology has already created in regard to contracts.

{60} The circumstances here definitely show knowledge of a serious soil saturation problem making it difficult, if not impossible, to prospectively measure the exact amount of material necessary to fill the space required to be filled. The October 2002 written discussions and instructions dealt with those problems. Hale's evidence appears to have shown an understanding that Hale would supply what was needed to meet the problem, and nothing in the written communications composing that understanding mentioned that Hale made an estimating error and that for that reason or, based on a particular subcontract provision, Hale had to assume the risk of the entire soil-related problem. Hale's, Alexander's, and Union Pacific's immediate attention to Hale's discovery of soil problems, and Union Pacific's and Alexander's immediate instructions to Hale to provide the needed material, are circumstances that might permit a reasonable inference that unavoidable conditions arose that could delay the project, unless the parties reached an understanding right away about how to deal with the soil problems. The primary question in this appeal does not require us to interpret or enforce the subcontract, or to evaluate freedom of contract policy or stability in the construction business but, instead, requires interpretation of the releases.

## II. Hale's Indemnification Obligation

{61} Hale asserts that the district court erroneously relied on the indemnification clause contained in the February 4, 2003, release requiring Hale to indemnify Alexander from Hale's claims for nonpayment, when the court awarded Alexander attorney fees and costs. Hale argues that this constituted error because the indemnification clause is so broad that its enforcement could violate NMSA 1978, § 56-7-1(A) (1971) (amended 2003 and 2005), which bars enforcement of an indemnification clause in construction contracts on public policy grounds where the indemnification is based on the indemnitee's own negligence. *See Piña v. Gruy Petroleum Mgmt. Co.*, 2006-NMCA-063, ¶¶ 1, 5, 9, 17-18, 139 N.M. 619, 136 P.3d 1029 (construing the oilfield anti-indemnity statute, NMSA 1978, § 56-7-2 (1999) (amended 2003), and upholding the Legislature's subordination of

freedom of contract to public policy behind invalidation of indemnity agreements as to loss resulting from the indemnitee's negligence).

█ {62} The indemnification clause in the contract at hand states:

[T]he undersigned agrees to defend and hold harmless the [O]wner, [C]ontractor and/or [L]ender, and/or the [P]rincipal and [S]urety from any claim or claims hereinafter made by the undersigned and/or its material suppliers, subcontractors or employees, servants, agents or assigns of such persons against the project.

Hale claims this clause is void as violating public policy because of its breadth. That is, Hale asserts that the clause, covering "any and all claims," is written too broadly in that it does not differentiate by the type of claim or cause of harm, and, in particular, does not exclude indemnification prohibited under Section 56–7–1. The validity of an indemnification agreement and interpretation of statutes raises issues of law, which we review de novo. *Fort Knox Self Storage, Inc. v. W. Techs., Inc.*, 2006–NMCA–096, ¶ 10, 140 N.M. 233, 142 P.3d 1.

█ {63} Section 56–7–1(A) relates only to indemnification for claims "arising out of bodily injury to persons or damage to property caused by, or resulting from, ... the negligence, act or omission of the indemnitee." We see no basis on which to hold that the indemnification clause in question is invalid as against public policy because it fails to expressly exclude such claims. Hale offers no persuasive or even applicable authority to persuade us to the contrary. No rationale or authority asserted by Hale provides a basis to hold the indemnification clause unenforceable under the circumstances in this case.

{64} In reply only, Hale relies on *Sierra v. Garcia*, 106 N.M. 573, 746 P.2d 1105 (1987). *Sierra* was a wrongful death action in which a defendant general contractor sought to enforce an indemnity agreement against a third-party defendant subcontractor. *Id.* at 574, 746 P.2d at 1106. In construing Section 56–7–1, our Supreme Court voided the indemnity agreement in its entirety because

the agreement could not be reformed to indemnify the indemnitee for only the indemnitor's negligence. *Sierra*, 106 N.M. at 575–76, 746 P.2d at 1107–08. Hale's reliance on *Sierra* for the first time in its reply brief comes too late. *Summit Props., Inc. v. Pub. Serv. Co. of N.M.*, 2005–NMCA–090, ¶ 30, 138 N.M. 208, 118 P.3d 716 (refusing to consider an argument raised for the first time in a reply brief). Furthermore, this reliance is misplaced. We see no reason to void the indemnification agreement in the present case when its attempted application is to circumstances clearly outside of the prohibition in Section 56–7–1. The agreement does not have the defect present in *Sierra*, in which the agreement could not be parsed or read in any way to eliminate the indemnity for any loss arising in whole or in part from the indemnitee's own negligence. *See Sierra*, 106 N.M. at 576, 746 P.2d at 1108. Even assuming that the indemnity provision was the sole basis on which the district court awarded Alexander attorney fees and costs, we reject Hale's argument that the indemnity provision was void and could not support the court's award.

{65} Of course, whether Alexander is ultimately entitled to fees and costs under this enforceable indemnity agreement depends on whether, on remand, the district court again holds in Defendants' favor on Hale's claim for compensation for additional work. Thus, on remand, the district court will need to reevaluate whether Alexander has a right to recover any fees and costs under the indemnity agreement.

**III. Hale's Quantum Meruit Claim**

{66} Hale's quantum meruit claim seeks restitution, in quasi-contract, for unjust enrichment. The Court in *Hydro Conduit Corp. v. Kemble*, 110 N.M. 173, 175, 793 P.2d 855, 857 (1990), recognized the principle that "[o]ne who has been unjustly enriched at the expense of another may be required by law to make restitution." (Internal quotation marks and citation omitted.) "This quasi-contractual obligation is created by the courts for reasons of justice and equity, notwithstanding the lack of any contractual rela-

tionship between the parties." *Id.* (internal quotation marks and citation omitted).

{67} "Subcontractors' suits against property owners are generally not favored. Remedy is instead viewed as best sought from the underlying general contractor." *Ontiveros Insulation Co. v. Sanchez,* 2000–NMCA–051, ¶ 12, 129 N.M. 200, 3 P.3d 695 (citations omitted). This view is based on the notion that "equity does not take the place of remedies at law, it augments them; in this regard, an action in contract would be preferred to one in quasi-contract." *Id.* Generally, a subcontractor has no right to claim quantum meruit against an owner when the owner has paid all or substantially all of what it owes under its contract with the prime contractor. *See Hydro Conduit,* 110 N.M. at 175–76, 793 P.2d at 857–58 (recognizing the general rule that the subcontractor's claim of unjust enrichment cannot be sustained against the owner when the owner has paid the general contractor for the work performed and material supplied); *see also Sundance Mech. & Util. Corp. v. Atlas,* 118 N.M. 250, 255, 880 P.2d 861, 866 (1994) (stating that "[g]enerally, a subcontractor cannot recover against the landowner in quasi-contract [for unjust enrichment] when that landowner has paid 'a very substantial part' of the contract amount to the general contractor"). Important to Hale's claim, the Court in *Hydro Conduit* also stated that "a subcontractor who has lost his mechanic's lien claim against a property owner may have a claim in quantum meruit where the owner has not paid the general contractor." 110 N.M. at 175, 793 P.2d at 857 (internal quotation marks and citation omitted).

{68} Hale asserts that the issue at hand is whether Union Pacific can successfully assert a defense to the quantum meruit claim where, as Hale claims here, Alexander denied any obligation to Hale and never billed Union Pacific for Hale's claim. *See Ontiveros Insulation,* 2000–NMCA–051, ¶¶ 1, 13, 21, 129 N.M. 200, 3 P.3d 695 (recognizing that subcontractors' suits against property owners are disfavored, but declining "to apply this traditional reticence regarding consideration of equitable relief" in the context of the case, and affirming the district court's grant of equitable relief to the subcontractor against the property owners). The substance of Hale's position is that Union Pacific did not pay Alexander for the additional subballast work that Hale performed, work that Union Pacific directed Alexander to have done as a result of Amarillo's recommendations, thereby exposing Union Pacific to liability in quantum meruit.

{69} The path to reaching a decision on this issue is not all that clear. The parties did have a subcontract. They followed contract procedure, using written change orders. Depending on how the release issues and contract issues, if any, are decided on remand, it may be arguable that Hale should not be permitted to avoid the subcontract and seek an unjust enrichment remedy. Yet, Hale may show enough to prove that it both supplied more quantity of subballast than the quantities specified in the subcontract documents and in the change orders, and also that Defendants wanted, if not required, Hale to supply the additional quantity. Assuming this to be provable, it would also appear to be arguable that Union Pacific received more material than it paid for.

{70} As stated earlier in this opinion, we have determined that a remand is required relating to Hale's breach of contract claim and remedy. We are therefore not prepared to attempt a reasoned and careful decision on the court's quantum meruit claim dismissal at this time, and we reverse the quantum meruit dismissal. The district court should revisit that issue again in further proceedings.

## IV. Hale's Interest Penalty Claim

{71} Hale sought a Retainage Act interest penalty against Defendants. *See* NMSA 1978, §§ 57–28–1 to –11 (2001, as amended through 2007) (currently known as the Prompt Payment Act). The Retainage Act, in force at the time retainage was withheld in this case, generally provides that, except in circumstances that do not exist here, "retainage shall not be withheld on any construction contract within New Mexico unless an escrow arrangement is used." § 57–28–4(A). Retainage is defined in the applicable statute as "money payable to the contractor or sub-

contractor that has been withheld by the owner conditioned on substantial completion of all work in connection with a construction contract[.]" § 57–28–2(E) (2001). The Retainage Act requires all construction contracts to "provide that contractors and subcontractors make prompt payment to their subcontractors and suppliers for amounts owed for work performed ... within seven days after receipt of payment from the owner, contractor or subcontractor." § 57–28–5(C). Retainage may be held under certain circumstances, and therefore not paid, until substantial completion of the applicable work, but only "if the escrow arrangement described in Section [57–28–6] of the Retainage Act is used." § 57–28–5(F) (2001). Under Section 57–28–6(J) (2001), "the form and provisions of the escrow agreement shall be included in all solicitations for construction services and shall be given to the contractor and subcontractors prior to entering into a contract[.]" Under Section 57–28–5(C), if a contractor fails to make "prompt payment" to its subcontractor as required, the contractor must pay an interest penalty to the subcontractor starting "on the eighth day after payment was due."

■ {72} Although the Retainage Act is not an easy read, we read it to require a contractor in Alexander's shoes to establish an escrow account in conjunction with the owner or otherwise, if retainage is to be held beyond the seven-day limitation in Section 57–28–5(C). The Act targets contractors as well as owners who withhold retainage without depositing the funds in an escrow account: a contractor is subject to penalty pursuant to Section 57–28–5(C), and an owner is subject to penalty pursuant to Section 57–28–10 (2001). The interest is computed at 1.5% of the undisputed amount per month. §§ 57–28–5(C),–10. The statutory penalty in Section 57–28–5(C), relating to a contractor, is imposed "until payment is issued," and the penalty in Section 57–28–10, relating to an owner, is imposed "until retainage is paid."

{73} In the present case, Union Pacific and Alexander each required that a 10% retainage be withheld from each payment application. Alexander withheld approximately that from its payments to Hale. It is

undisputed that neither Union Pacific nor Alexander maintained an escrow account as required under the Retainage Act. The record is unclear as to precisely when Alexander intended to pay Hale the retainage. In a discussion at the December 5, 2005, hearing on the issue, the court asked Alexander whether there was anything in writing that showed that Alexander offered to pay the retainage and that Hale refused to accept it. Alexander did not produce anything in writing and the parties apparently agreed that there had not been any offer to pay the retainage before the year 2005. Nevertheless, Alexander stated that once Hale filed its claim of lien on March 10, 2003, which Alexander referred to as "the critical date," and Alexander had not been provided a release for the payment of retainage, Alexander knew that the retainage would become the subject of litigation.

{74} At the same hearing, the court discussed Section 57–28–8 of the Retainage Act which provides:

Ten days after certification of completion, any amounts remaining due the contractor or subcontractor under the terms of the contract shall be paid upon the presentation of the following:

A. a properly executed release and duly certified voucher for payment;

B. a release, if required, of all claims and claims of lien against the owner arising under and by virtue of the contract other than such claims of the contractor, if any, as may be specifically excepted by the contractor or subcontractor from the operation of the release in stated amounts to be set forth in the release; and

C. proof of completion.

Apparently connecting Section 57–28–8 with Section 57–28–5(C), the court stated:

[Y]ou may think it sounds arbitrary, but I don't think it is. Ten days after, and I'm referring back to [Section] 57–28–8 that says, "[T]en days after certification, any amounts remaining due the contractor shall be paid upon the presentation of a release, if required." There was no release required before—I mean, there was no release provided. Before [Hale] could

get the rest of it, they had to provide a release. They weren't going to require that—they weren't going to provide that release because they wanted the additional because they underbid it.

The court indicated it would set the penalty "cut-off date" as February 24, 2003, when Union Pacific certified the project completed. The court then extended the running of the interest penalty ten days, presumably pursuant to Section 57-28-8.

{75} On December 19, 2005, the district court entered the following findings.

5. [Alexander] violated the Retainage Act by failing to maintain an escrow account and therefore Hale is entitled to an interest penalty on retainage amounts held by [Alexander] through March 7, 2003, in the total amount of $2,593.79.

6. The Retainage Act penalty should be imposed only through March 7, 2003, the date Hale filed its Claim of Lien, because Hale's Claim of Lien called into dispute the amounts owed by [Alexander] to Hale and made claim for amounts which this Court has previously determined were not owed by [Alexander] or [Union Pacific] to Hale.

{76} Hale asserts that the district court erred in limiting the interest penalty and that it is entitled to the penalty amount through the date judgment was entered in Hale's favor on the retainage claim. Hale primarily argues that Alexander's "withholding of retainage was wrongful in the first instance" and that failure to deposit retainage in an escrow account could be resolved only by payment of the retainage, and not by any completion date. Hale argues it was error to hold that the date of certification of completion established the cut-off date for interest penalty. We review the issue of the application of the Retainage Act provisions to the facts de novo. *Maestas v. Zager*, 2007-NMSC-003, ¶ 8, 141 N.M. 154, 152 P.3d 141.

{77} The court's determinations are somewhat confusing. It is unclear from the record whether, and if so, when, Alexander actually tendered and Hale refused the retainage because it would not sign a release. It is also unclear from the record whether Hale was contractually required to sign a release for the retainage and, if it was required to

sign a release, what the content of the release would be. It appears that the court assumed that Alexander would have tendered the funds at the time Union Pacific certified the project as completed, and chose the certification date, February 24, 2003, as the cut-off date which, under Section 57-28-8, started a ten-day period running. Ten days from February 24 was March 6, 2003. The court chose March 7, 2003, as the last day the penalty would run. However, the court stated in its findings that March 7 was chosen because it was the date Hale filed its claim of lien, presumably thinking that this was the date that Hale placed the retainage in dispute and opened up possible litigation. Yet March 7 was not the date the claim of lien was filed; the claim of lien was filed on March 10.

{78} Engaging in reasonable speculation in an attempt to understand on what the district court's ultimate ruling was based, we surmise that the court's ruling was based on perceptions something like: (1) the parties had discussed the retainage at some point and it was apparent that Hale would not sign a release for the retainage, because Hale did not want to release its claim for compensation for the additional subballast; and (2) at least at or soon after certification, the retainage was due and payable and, whether or not a release was going to be received, Alexander had cause to withhold the retainage once Hale filed its claim of lien. The court appears to have decided that, although Sections 57-28-5 and 57-28-10 (2001) required an interest penalty to be paid if an escrow account was not maintained and the retainage amount was not deposited in the account, certain events could intervene that would stop the running of the penalty before actual payment.

{79} We read the Retainage Act as penalizing contractors who do not establish escrow accounts and do not place retainage in those accounts. We see nothing in the Act that provides any cut-off date, other than payment, for the running of the interest penalty. Although we do not hold that no exception could exist, we fail to see how the certification provision in Section 57-28-8 creates

an exception. We see nothing in Section 57–28–8 that indicates it is tied into the escrow requirement; it merely states when and on what conditions final payment is to be made under the terms of the contract.

{80} Nevertheless, Section 57–28–8 is pertinent to the extent that it covers payment of retainage as an amount remaining due under the contract. If, in fact, Alexander tendered the retainage to Hale, and if Hale refused to sign a release, Alexander may have been justified in refusing to turn the funds over to Hale, thus perhaps providing a reasonable basis for the district court to use the certification date as the cut-off date for measuring the running of the interest penalty. The retainage, however, was money indisputably owed under the subcontract for work already performed by Hale.

{81} A concern we have, therefore, is that if a release for retainage required Hale to release its claim for all additional compensation for additional work, Hale may have been justified in refusing a broad release that covered that additional compensation. It may be that Alexander should have tendered a more limited release to discharge its already liquidated obligation under both the subcontract and the Act. It does not appear to us that these issues were developed in the summary judgment proceedings or in argument before the district court or this Court. We think that, before a determination can reasonably be made in regard to the cut-off date for the running of the penalty, these facts must be developed. We therefore reverse the court's determination of March 7, 2003, as the date the running of the interest penalty against Alexander stopped, and remand for further proceedings on this issue consistent with the concerns we raise in this opinion.

## V. Hale's Lack–of–Reliance Argument

{82} Hale argues that Union Pacific did not change its position in reliance on, or did not otherwise rely on, the February 4, 2003, release. Hale also argues that Alexander could not have relied on the releases to obviate responsibility to compensate Hale for the additional work and materials. One of Hale's points for reversal is that genuine issues of material fact existed as to reliance. Because we are remanding the release issues, we leave the foregoing reliance questions for the district court's consideration.

## VI. Defendants' Cross–Appeal

{83} Defendants assert in their cross-appeal that the district court erred in limiting their recovery of fees and costs incurred. They also assert that the court erred in awarding Hale an interest penalty against Alexander under the Retainage Act, and in awarding all attorney fees to Hale. Further, Defendants assert that they are entitled to all fees they have incurred on appeal.

### A. Defendants' Point, Right to Recover Fees and Costs

{84} Because the determination of those issues we have remanded to the district court may materially effect the extent, if any, of Defendants' entitlement to attorney fees and costs, we do not address this issue on appeal. We direct the district court to reevaluate this issue, depending on the ultimate disposition of the issues we have remanded.

### B. Defendants' Point, No Interest Penalty Liability

{85} Defendants contend that the district court erred in imposing a Retainage Act interest penalty and attorney fees against Alexander for failure to maintain an escrow account. We have set out most of the pertinent provisions of the Retainage Act earlier in this opinion.

### 1. Initial Matter, Grant of Relief Outside the Pleadings

{86} Defendants first contend that the court erred in granting relief to Hale that was outside the issues raised by the pleadings. Defendants assert that Hale did not plead a claim of a right to an interest penalty and attorney fees against Defendants for violation of the Retainage Act escrow account provisions. They also assert that Hale did not raise any Retainage Act issue until after the district court granted Defendants' three motions for summary judgment, when Hale, according to Defendants, raised the entirely

new Retainage Act claim. Defendants acknowledge that in earlier answers to interrogatories, in describing its damages, Hale claimed interest pursuant to the Retainage Act for failure to pay an application for payment within twenty-one days of submission of the application. *See* § 57–28–5(A) (2001) (providing for an interest penalty when an owner fails to pay the contractor within twenty-one days after an undisputed request for payment for amounts due, except for retainage). However, Defendants argue that while this damages claim may have been fairly raised in Hale's pleadings at the time, it was not a claim for interest or attorney fees based on a violation of the Retainage Act escrow requirements.

{87} Further, Defendants assert, no claim for interest or attorney fees based on failure to maintain an escrow account can be found in Hale's pleadings, nor can such a claim be fairly raised in a case for breach of contract and quantum meruit based on additional work under a construction contract. In addition, Defendants assert that the existence of an escrow account for retainage was never pursued in discovery or the subject of discovery. Finally, on this point, Defendants assert that a claim under the Retainage Act had to be separately pled as a distinct cause of action as indicated in Section 57–28–11 (2001), which states that "[i]n an action to enforce the provisions of the Retainage Act, the court may award court costs and reasonable attorney fees." (Citation omitted.) For all of these reasons, Defendants argue, the district court erred in awarding an interest penalty and attorney fees to Hale under the Act.

{88} Defendants rely on *Federal National Mortgage Ass'n v. Rose Realty, Inc.*, 79 N.M. 281, 282, 442 P.2d 593, 594 (1968), which states that "[a] judgment may not grant relief which is neither requested by the pleadings nor within the theory on which the case was tried." Defendants also rely on *Leonard Farms v. Carlsbad Riverside Terrace Apartments, Inc.*, 90 N.M. 34, 36, 559 P.2d 411, 413 (1977), which states that "[a] court may not grant judgment for relief which is neither requested by the pleadings nor within the theory on which the case was tried." These

are salient rules, but they do not assist Defendants. Unlike these cases, in the case at hand the issue of whether Alexander violated the Retainage Act by failing to deposit the retainage into escrow was raised to the judge. Hale mentioned in the hearing on Defendants' summary judgment motions that under the Act "all retainage shall be held in an escrow agreement or you're not allowed to hold any at all." Hale's counsel also referred to the seven-day payment requirement. The escrow requirement issue was fully briefed and argued in relation to Hale's motion for summary judgment. In its motion for summary judgment, Hale sought retainage wrongfully withheld, plus a monthly interest penalty under Section 57–28–10 (2001) and attorney fees under Section 57–28–11 (2001). In its memorandum in support of its motion, Hale elaborated on its penalty claim. Hale pointed out that Section 57–28–10 (2001) required the owner to pay a penalty. However, based on an understanding that Union Pacific released retainage to Alexander, Hale asserted the penalty liability of Alexander under Section 57–28–5(C) for failure to pay the retainage amount within seven days of receipt of the retained funds from Union Pacific. This is not a situation in which the relief granted was not raised to the court. As such, we conclude that the district court did not abuse its discretion in granting the relief. *See San Juan Water Comm'n v. Taxpayers & Water Users of San Juan County*, 116 N.M. 106, 109, 860 P.2d 748, 751 (1993) (stating that "[a] trial court may in its discretion conform the pleadings to the evidence" and "[w]hen issues not specifically raised in the pleadings are litigated with either the express or implied consent of the parties, the issues are treated as if they had been set forth in the pleadings"). Further, we are unpersuaded that Hale's claim could be raised only in a separate, distinct Retainage Act cause of action. Neither the statute nor Defendants' proffered cases require that holding.

**2. Imposition of Penalty Under Retainage Act**

{89} Defendants ask us to construe the Retainage Act in a manner that does not permit imposition of an interest penalty on a

contractor for failure to deposit retainage in an escrow account or to release retainage as required in the Retainage Act. The issue here is one of statutory construction, which requires de novo review. *See Bd. of Comm'rs of Doña Ana County v. Las Cruces Sun–News*, 2003–NMCA–102, ¶ 19, 134 N.M. 283, 76 P.3d 36. We note that the Act requires that "retainage shall not be withheld *on any construction contract* within New Mexico unless an escrow arrangement is used." § 57–28–4(A) (2001) (emphasis added). We read Section 57–28–5(C) and (F) (2001) to indicate legislative intent to penalize a contractor for failure to make a retainage payment within a specified period of time if there is no escrow arrangement. The Act also requires that "the form and provisions of the escrow agreement shall be included in all solicitations for construction services and shall be given to the contractor and subcontractors prior to entering into a contract[.]" § 57–28–6(J) (2001).

**■** {90} Defendants argue that the imposition of the penalty against Alexander was contrary to Hale's request and the plain meaning of Section 57–28–10 (2001). Maintaining that under Section 57–28–10 (2001) "imposition of the penalty is unambiguously limited to an owner," Defendants argue that the Act does not permit imposition of the penalty on Alexander, a contractor. We reject Defendants' argument. Hale sought a penalty under Section 57–28–5(C). We see no indication that the court awarded the penalty against Alexander under Section 57–28–10 (2001). Moreover, it seems unmistakably clear that contractors such as Alexander are required to have an escrow arrangement and to deposit retainage into an escrow account. *See* §§ 57–28–4(A) (2001), –5(C), (F), –6(J) (2001).

## C. Defendants' Point, Attorney Fees Payable to Hale

{91} Defendants also assert that the court erred in awarding all of Hale's attorney fees and costs. *See* § 57–28–11 (2001) (allowing the court to award reasonable attorney fees in an action to enforce the Retainage Act). In awarding the full amount of Hale's fees and costs, the court stated that "basically [the Retainage Act claim has] been part of the whole argument because from the very beginning he did say 1.5 percent per month, and I think that's kind of been intertwined with the whole thing." Further, the court stated:

He probably didn't spend 60 minutes of every hour on that particular issue, but that was an intertwined issue in the entire thing, that's why, you know, he's been wanting a quantum meruit and everything, but all along it's also included the 1.5 percent. That's why I'm giving him the 100 percent.

{92} Defendants argue that an award of attorney fees under a statutory claim must be limited to the work done on that particular claim. *See Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶¶ 35–36, 129 N.M. 586, 11 P.3d 550 (holding that an award of fees based on hours spent on the whole litigation may be excessive if the plaintiff obtained only partial success); *Jaramillo v. Gonzales*, 2002–NMCA–072, ¶¶ 38–41, 43, 132 N.M. 459, 50 P.3d 554 (holding that it was not an abuse of discretion to award only that portion of the plaintiff's total fees that were related to the specific claim that allowed recovery of attorney fees). Thus, Defendants argue, only that portion of fees and costs attributable to Hale's Retainage Act claim are recoverable and that an award of anything more was not reasonable.

**■** {93} We review the court's award of attorney fees for abuse of discretion, but when the issue involves misapplication of law to facts, we review the application of the law to the facts de novo. *See Hise v. City of Albuquerque*, 2003–NMCA–015, ¶ 8, 133 N.M. 133, 61 P.3d 842; *Jaramillo*, 2002–NMCA–072, ¶ 38, 132 N.M. 459, 50 P.3d 554.

{94} Following consideration of Defendants' three motions for summary judgment, the district court in September 2005 ordered that Hale's recovery was "limited to the $74,249 'final payment' due under the Subcontract," and the court reserved jurisdiction on the question as to whether Hale was entitled to recover interest under the Retainage Act. Hale then filed its motion for partial summary judgment on September 20, 2005,

seeking Retainage Act interest and attorney fees. The motion was based on Defendants' failure to pay the retainage of $74,249.22 they "wrongfully withheld." Defendants then filed a motion on September 27, 2005, to recover their attorney fees. In its response to Defendants' motion for attorney fees, Hale attached its attorney fee bills dated from July 2004 through August 2005 to show that Hale's counsel charged only $13,886.55 in contrast to Defendants' counsel's charges of $86,667.50 during the same period. At the hearing on December 5, 2005, there were very brief discussions about reducing Hale's $13,886.55 in attorney fees to $13,000, following which the court orally awarded Hale $13,000.

{95} We agree with Defendants on this issue. The claims on which Hale prevailed were arguably its claim for retainage withheld and definitely its claim for interest penalty and attorney fees under the Retainage Act. Hale did not prevail on its claim for additional amounts under its breach of contract and quantum meruit claims. Hale points us to nothing in the record indicating a basis on which the district court could conclude that all of Hale's fees were attributable to the claim for retainage and Retainage Act penalty. Hale made no attempt in the district court and makes no attempt on appeal to show the intertwining of work and claims that Defendants assert did not exist. We recognize that the district court was closely involved in this litigation and obviously had hands-on knowledge of the facts and issues. We further recognize that "[s]ome of the work may be inextricably intertwined, making it difficult or impossible to segregate" the work performed on different claims. *Hinkle, Cox, Eaton, Coffield & Hensley v. Cadle Co. of Ohio*, 115 N.M. 152, 158, 848 P.2d 1079, 1085 (1993). However, under *Gonzales* and *Jaramillo*, we hold that the district court erred in failing to allocate Hale's fees to time spent on its claims related to retainage. For this reason, and because we are remanding issues to the district court, the ultimate disposition of which may materi-

ally affect the extent, if any, of Hale's entitlement to attorney fees, the district court on remand should reassess the attorney fee issue.

## D. Defendants' Request for Fees and Costs Incurred on Appeal

{96} Defendants assert that, if they prevail in this appeal, they should be entitled to their attorney fees incurred on appeal. Because we are remanding issues to the district court and the ultimate disposition of the issues that we are remanding may materially affect the extent, if any, of Defendants' entitlement to attorney fees, we decline to address Defendants' request for fees and costs on appeal.

## CONCLUSION

{97} We reverse the district court's summary judgment dismissing Hale's contract claim for the reasons stated in this opinion and we remand to the district court for proceedings consistent with this opinion. Because determinations in further proceedings on remand may affect Hale's quantum meruit claim and the amounts of the parties' entitlements to attorney fees, the district court on remand is to again address, as necessary, the awards of attorney fees to Hale and to Defendants, and also whether Hale can prevail on its quantum meruit claim. We affirm the district court's denial of costs sought by Defendants. We agree with the district court's ruling that Alexander violated the Retainage Act, entitling Hale to an interest penalty, but remand for a clarification of the appropriate penalty cut-off date.

{98} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO and RODERICK T. KENNEDY, Judges.