# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2023-NMCA-005

Filing Date: August 9, 2022

No. A-1-CA-38023

BRUCE PUMA and KATHLEEN PUMA,
for Themselves and All Others Similarly
Situated,

   Plaintiffs-Appellees/Cross-Appellants,

v.

WAL-MART STORES EAST, LP; APPLICA
CONSUMER PRODUCTS, INC.; and THE
BLACK & DECKER CORPORATION,

   Defendants-Appellants/Cross-Appellees.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
C. Shannon Bacon, District Judge

Floyd D. Wilson, P.C.
Floyd D. Wilson,
Cedar Crest, NM

Freedman Boyd Hollander Goldberg Urias & Ward, P.A.
David A. Freedman
Christopher A. Dodd
Albuquerque, NM

for Appellee

Holland & Hart LLP
Larry J. Montaño
Santa Fe, NM

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Jennifer G. Anderson
Albuquerque, NM

Mitchell, Silberberg & Knupp LLP
Jeffrey Richardson
Gilbert S. Lee
Los Angeles, CA

for Appellants

McCoy Leavitt Laskey LLC
H. Brook Laskey
Albuquerque, NM

Goldberg Segalla LLP
Laura A. Colca
Buffalo, NY

for Amicus Curiae Society of Product Licensors Committed to Excellence

**OPINION**

**BOGARDUS, Judge.**

**{1}**     This appeal and cross-appeal arise in response to the district court's decisions relating to Bruce and Kathleen Puma's (the Pumas) claim that Wal-Mart Stores East LP, Applica Consumers Products, Inc., and The Black & Decker Corporation (collectively, Defendants) violated the Unfair Practices Act (the UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2019). The parties argue whether the district court correctly determined or erred in (1) concluding that Defendants violated the UPA; (2) denying the Pumas damages based on unjust enrichment; and (3) awarding the Pumas certain attorney fees. We affirm in part and reverse in part.

**BACKGROUND**

**{2}**     This case arises from the Pumas' purchase of a Black & Decker Corporation (Black & Decker) branded CM1050 B coffeemaker (the Coffeemaker) from a Wal-Mart store in Albuquerque, New Mexico in May 2013. At the time, Wal-Mart displayed models of various coffeemakers, including the Coffeemaker. Apart from its display model and box, Wal-Mart did not display any advertising for the Coffeemaker. The Pumas compared various coffeemakers, reviewing the boxes of various models, including the box in which the Coffeemaker was packaged. The Pumas also saw the display model of the Coffeemaker. Wording on both the Coffeemaker and its box stated it was a Black & Decker product. The Coffeemaker and its box also displayed the Black & Decker hexagon logo used at the time.

**{3}**     The Pumas sought a reliable coffeemaker, and Mr. Puma had owned Black & Decker tools in the past without any concerns about quality. Black & Decker is a well-known company that has a reputation for producing well-built products for good value. Mr. Puma believed that the Coffeemaker was a Black & Decker product that he could purchase without any problems, Mrs. Puma believed the Coffeemaker was a better product than Wal-Mart's lower-priced store-brand coffeemaker, and the Pumas were willing to pay more for the Coffeemaker than the store-brand coffeemaker to the extent the Coffeemaker was a better, more reliable product. The Pumas paid $19.92 for the Coffeemaker, believing it was a Black & Decker product.

**{4}** Although Black & Decker has at all relevant times continued to produce and sell consumer products with the Black & Decker name and logos, Black & Decker did not design, manufacture, distribute, or warrant the Coffeemaker. Rather, the Coffeemaker was an Applica Consumers Products, Inc. (Applica) product. Applica and Black & Decker were parties to a trademark licensing agreement whereby Applica paid royalties to Black & Decker in exchange for Applica's ability to use the Black & Decker name and trademarks in the sale of small kitchen appliances, including the Coffeemaker. There is no corporate affiliation between Black & Decker and Applica, and a consumer reading the information on the Coffeemaker's box would not know of any relationship between Black & Decker and Applica.

**{5}** The Pumas sued Defendants, asserting various claims, including violations of the UPA based on the Coffeemaker's branding (the UPA name brand claim) and capacity (the 12-cup claim), unjust enrichment, and breach of duty on behalf of other individuals who bought the Coffeemaker. The district court certified a class defined to include persons who purchased the Coffeemaker at a New Mexico Wal-Mart store from 2009 to 2013, approximately 40,600 class members.

**{6}** Following a bench trial, the district court entered findings of fact and conclusions of law. As to the Pumas' UPA name brand claim, the district court concluded that Defendants' conduct constituted an "unfair or deceptive trade practice." The district court also concluded that, pursuant to the UPA, the Pumas were entitled to $300 in statutory damages and attorney fees, but because the class could not establish actual damages, it was not entitled to damages. With regard to the unjust enrichment claim, the district court concluded that, although the Pumas and class members had not received a Black & Decker product in purchasing the Coffeemaker, the Pumas were not entitled to damages for unjust enrichment because they had not met their burden of proof in establishing the amount of these damages.

**{7}** The Pumas moved for attorney fees and requested a lodestar amount representing the fees billed for the entire case and a 2.0 multiplier. After a hearing on the motion, the district court awarded a lodestar that represented a reduction of the amount requested by the Pumas, but that was not reduced as significantly as Defendants argued was appropriate. Further, the district court applied a multiplier of 1.5 to the lodestar.

**{8}** Defendants appeal and the Pumas cross-appeal.

**DISCUSSION**

**I.    The District Court Did Not Err in Concluding Defendants Violated the UPA**

**A.    The Lanham Act Issue**[1]

---

1We allowed amicus briefing from the Society of Product Licensors Committed to Excellence on this issue as well as responsive briefing from the Pumas.

**{9}** In their posttrial closing brief, Defendants argued that their use of the "Black & Decker" trademark on the Coffeemaker[2] did not constitute an unfair or deceptive trade practice under the UPA because the Trademark Act of 1946 (Lanham Act), 15 U.S.C. §§ 1051 to 1141n, which governs federal trademark law, countenanced their use of the trademark.

**{10}** Under the Lanham Act, registered trademarks may "be used legitimately by related companies." 15 U.S.C. § 1055. "Related companies" include "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. Defendants thus asserted that, under the Lanham Act, a trademark owner (here, Black & Decker) may grant a license and be protected as long as the trademark owner exercises quality control of the goods sold under its trademark by the licensee (here, Applica). Defendants thus contended that, under the Lanham Act, the ultimate source or manufacturer of a product need not be identified by a brand name as long as the trademark owner exercises sufficient oversight over the nature and quality of the goods sold under its licensed mark. Defendants argued that their collective use of the Black & Decker trademark comported with the Lanham Act because Black & Decker and Applica entered into a trademark licensing agreement that permitted Applica to market the Coffeemaker under the Black & Decker name and mandated that Black & Decker exercise control and oversight to ensure the Coffeemaker met Black & Decker's quality standard. In essence, Defendants argue that if the Lanham Act allows Applica to market the Coffeemaker, the arrangement cannot constitute a violation of the UPA. We disagree.

**{11}** Rejecting Defendants' contentions in this regard, the district court issued a letter stating that the Lanham Act did not apply in the context of a UPA claim. The district court then entered findings of fact and conclusions of law, ruling that Defendants' branding of the Coffeemaker constituted an unfair or deceptive trade practice under the UPA.

**{12}** On appeal, Defendants argue the district court committed legal error in arriving at its UPA branding decision without applying the Lanham Act. Because the district court's judgment arises from its misunderstanding of trademark law, Defendants argue, certain disputed findings of fact warrant no deference. *See Hughes v. Hughes*, 1978-NMSC-002, ¶ 52, 91 N.M. 339, 573 P.2d 1194 ("[A district] court's findings of fact, where based on an erroneous legal theory, are not binding on the appellate court."). Defendants also argue that their proposed findings of fact relating to Black & Decker's oversight of products Applica sold under its trademark should be deemed admitted, leaving us to decide only whether they are material. In sum, Defendants argue that we should apply Lanham Act precedent to reverse the district court's erroneous interpretation of trademark licensing agreements.

---

2Our references in this opinion to use of the Black & Decker trademark in branding the Coffeemaker includes use of the company name and hexagon logo on the Coffeemaker's box.

### 1.     Standard of Review

**{13}** We apply a de novo standard of review to determine whether the district court applied the correct legal standard. *See Brooks v. Norwest Corp.*, 2004-NMCA-134, ¶ 7, 136 N.M. 599, 103 P.3d 39 ("Although a misapplication of the law is considered an abuse of discretion, our courts review de novo the initial decision of whether the correct legal standard has been applied."). To the extent Defendants' appeal requires us to interpret the UPA, our review is de novo. *See Cates v. Mosher Enters., Inc.*, 2017-NMCA-063, ¶ 14, 403 P.3d 687 ("We review interpretation of statutory provisions de novo."); *Aguilera v. Palm Harbor Homes, Inc.*, 2004-NMCA-120, ¶ 6, 136 N.M. 422, 99 P.3d 672 ("This dispute requires us to determine the correct application of the UPA as well as the effect of the Uniform Arbitration Act on [the plaintiff's] UPA claims. These are questions of statutory interpretation subject to de novo review.").

### 2.     Legislative Intent of the UPA

**{14}** Because the district court concluded that Defendants' branding of the Coffeemaker violated the UPA, we look to whether our Legislature intended that our courts' application of the UPA be guided by or should incorporate Lanham Act precedent. "In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background." *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350. "To determine legislative intent, we look not only to the language used in the statute, but also to the purpose to be achieved and the wrong to be remedied." *Britton v. Off. of Att'y Gen.*, 2019-NMCA-002, ¶ 27, 433 P.3d 320 (internal quotation marks and citation omitted).

**{15}** "The Legislature intended the UPA to serve as remedial legislation for consumer protection, and we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent." *Gandydancer, LLC v. Rock House CGM, LLC*, 2019-NMSC-021, ¶ 24, 453 P.3d 434 (internal quotation marks and citation omitted). "New Mexico cases have historically interpreted the UPA to focus exclusively on consumer protection, protecting innocent consumers." *Id.* ¶ 29 (internal quotation marks and citation omitted); *see id.* ¶ 20 (stating that in removing the phrase "unfair methods of competition" from both the title and the definition section and from the declaration of unlawfulness, "the Legislature intended to remove competitive injury claims from the protected zone of interest" and concluding the alteration demonstrated "an intent to limit the zone of interest protected from unfair trade practices by the UPA to consumers, not competitors").

**{16}** The Lanham Act, by contrast, "was intended to make actionable the deceptive and misleading use of marks and to protect persons engaged in commerce against unfair competition." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992) (omission, internal quotation marks, and citation omitted). In construing the Lanham Act, which provides that "[t]he intent of [the Act] is . . . to protect persons engaged in [congressionally regulated] commerce against unfair competition," 15 U.S.C. § 1127,

"[a]t least half of the circuits hold (and none of the others disagree) that [this section] bars a consumer from suing under the [Lanham] Act." *Made in the USA Found. v. Phillips Foods, Inc.*, 365 F.3d 278, 280 (4th Cir. 2004); *see, e.g.*, *Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163, 1179 (3d Cir. 1993) (concluding that when Congress authorized federal courts to deal with false advertising claims under the Lanham Act, it "did not contemplate that federal courts should entertain claims brought by consumers"). Thus, while consumers may benefit from the Lanham Act's application, *see Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 321 (4th Cir. 2015) (stating that the Lanham Act's trademark protection provisions "protect consumers from confusion in the marketplace"), the Act's purpose—unlike the UPA—is to protect persons engaged in commerce. *See Colligan v. Activities Club of N.Y., Ltd.*, 442 F.2d 686, 692 (2d Cir. 1971) ("The [Lanham] Act's purpose, as defined in [Section] 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct.").

**{17}**   We next look to the language of the UPA to determine whether the Legislature intended that our courts' application of the UPA be guided by federal precedent interpreting the Lanham Act. Several UPA provisions prove relevant. Section 57-12-4 provides that, in construing Section 57-12-3—which prohibits unfair or deceptive trade practices—"the courts to the extent possible will be guided by the interpretations given by the federal trade commission [(FTC)] and the federal courts." Defendants contend this language does not mandate that courts *only* consider FTC decisions. Regardless, as the district court noted, "our Legislature instructed the courts to use FTC cases in the courts' interpretation of the state statute. In comparison, the Legislature did not expressly reference the Lanham Act and related cases and has not amended the provision to . . . do so." To the extent Defendants argue Section 57-12-4's use of "and the federal courts" should be read to include all federal court decisions, including cases interpreting the Lanham Act, such a result would produce a direction so broad as to be practically meaningless. *See Santa Fe Cnty. Bd. of Cnty. Comm'rs v. Town of Edgewood*, 2004-NMCA-111, ¶ 7, 136 N.M. 301, 97 P.3d 633 ("[W]e do not interpret a statute to render statutory language meaningless."). Had our Legislature desired that our courts be guided by Lanham Act precedent, it could have included such language in the statute. *See Chatterjee v. King*, 2011-NMCA-012, ¶ 15, 149 N.M. 625, 253 P.3d 915 (noting that "the Legislature knows how to include language in a statute if it so desires"), *rev'd on other grounds*, 2012-NMSC-019, ¶ 52, 280 P.3d 283.

**{18}**   The language of Section 57-12-2(D) (2009)[3] supports this interpretation. Defendants' argument is premised on their view that, under the Lanham Act, so long as the quality associated with the Black & Decker brand is maintained, failing to indicate the ultimate source or manufacturer of the Coffeemaker cannot constitute an unfair or deceptive trade practice under the UPA. Section 57-12-2(D)'s "definition of unfair or deceptive trade practices includes a nonexhaustive list of . . . such acts." *Gandydancer*, 2019-NMSC-021, ¶ 11. Among these acts, the Legislature has included conduct based on a product's quality as well as a product's source. *Compare* § 57-12-2(D)(2) ("causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods"), *with* § 57-12-2(D)(7) ("representing that goods . . . are of a particular standard

---

3All references to Section 57-12-2 in this opinion are to the 2009 version of the statute.

[or] quality . . . if they are of another"), *and* § 57-12-2(D)(17) ("failing to deliver the quality . . . of goods . . . contracted for"). The language of these subsections indicates that the Legislature intended that representations as to a product's source could be a basis for liability under the UPA, independent of that product's quality.[4] *See Am. Fed'n of State, Cnty. & Mun. Emps. (AFSCME) v. City of Albuquerque*, 2013-NMCA-063, ¶ 5, 304 P.3d 443 ("Statutes must . . . be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)). Our interpretation is also consistent with our Legislature's intent that "the UPA . . . serve as remedial legislation for consumer protection" and our precedent "interpret[ing] the provisions of [the UPA] liberally to facilitate and accomplish its purposes and intent." *Gandydancer*, 2019-NMSC-021, ¶ 24 (internal quotation marks and citation omitted). We, therefore, conclude that our Legislature did not intend to require courts to apply Lanham Act precedent in deciding UPA claims. Accordingly, the district court did not err in declining Defendants' invitation to apply Lanham Act precedent in ruling on the Pumas' UPA name brand claim.[5]

**{19}**    Having concluded that the district court was not required to apply Lanham Act precedent in ruling on the Pumas' UPA name brand claim, we cannot say the court's findings of fact were "based on an erroneous legal theory." *See Hughes*, 1978-NMSC-002, ¶ 52. Because Defendants have not otherwise developed an argument attacking the district court's findings of fact on substantial evidence grounds, the court's findings of fact are binding on appeal. *See Martinez v. Sw. Landfills, Inc.*, 1993-NMCA-020, ¶ 18, 115 N.M. 181, 848 P.2d 1108 ("[A]n appellant is bound by the findings of fact made below unless the appellant properly attacks the findings, and . . . the appellant remains bound if he or she fails to properly set forth all the evidence bearing upon the findings.").[6] We turn now to applying the district court's findings of fact to the UPA.

---

[4]We, therefore, need not look to FTC cases for guidance in this regard. *See Richardson Ford Sales, Inc. v. Johnson*, 1984-NMCA-007, ¶¶ 12-14, 100 N.M. 779, 676 P.2d 1344 (explaining that, unlike the UPA, the FTC Act does not define "unfair or deceptive" acts, resulting in federal courts supplying a general meaning to the those terms, and that were we to rely on federal decisions as to what constitutes an "unfair or deceptive" trade practice, "we would not be giving effect to the legislative definitions").

[5]In support of their contention that the district court erred in failing to apply Lanham Act precedent, Defendants also point to Section 57-12-7, which provides, "Nothing in the [UPA] shall apply to actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico or the United States, but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the [UPA]." But apart from asserting the district court's refusal to apply Lanham Act precedent would make Section 57-12-7 superfluous, Defendants do not further develop this argument. We therefore decline to address it. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed."); *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them."). To the extent Defendants' argument suggests that the Lanham Act preempts the UPA, we disagree. *See JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 919 (7th Cir. 2007) (stating that "the Lanham Act has not been interpreted as a statute with broad preemptive reach"); *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 41 (1st Cir. 2006) ("It is settled that the Lanham Act does not in general preclude state unfair competition statutes from operating.").

[6]To the extent Defendants urge us to adopt their proposed findings of fact related to Black & Decker's oversight and control of the products Applica sold under Black & Decker's trademark—which they

**B.    The UPA Name Brand Claim**

**{20}**    Defendants contend that the district court erred in concluding that Defendants' use of the Black & Decker trademark on the Coffeemaker constituted an unfair or deceptive trade practice as defined in Section 57-12-2(D) of the UPA. "When a party is challenging a legal conclusion, the standard for review is whether the law correctly was applied to the facts, viewing them in a manner most favorable to the prevailing party, indulging all reasonable inferences in support of the court's decision, and disregarding all inferences or evidence to the contrary." *Sheldon v. Hartford Ins. Co.*, 2008-NMCA-098, ¶ 7, 144 N.M. 562, 189 P.3d 695 (internal quotation marks and citation omitted).

**{21}**    "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 17, 125 N.M. 748, 965 P.2d 332. As discussed, Section 57-12-2(D)'s "definition of unfair or deceptive trade practices includes a nonexhaustive list of . . . such acts." *Gandydancer*, 2019-NMSC-021, ¶ 11.

**{22}**    The district court relied on three of the acts included in Section 57-12-2(D) to conclude that Defendants' actions constituted an unfair or deceptive trade practice: "representing goods . . . as those of another when the goods . . . are not the goods . . . of another," § 57-12-2(D)(1); "causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods," § 57-12-2(D)(2); and "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive." Section 57-12-2(D)(14).

**{23}**    As to the district court's conclusion under Section 57-12-2(D)(1), Defendants contend the district court's decision reflects a misapprehension of that subsection. Defendants rely on *Thompson v. Youart*, 1990-NMCA-012, ¶ 14, 109 N.M. 572, 787 P.2d 1255, for the proposition that Section 57-12-2(D)(1) "is the statutory codification of the common law doctrine of 'palming off' or 'passing off,'" and that "[p]alming off is an attempt to make a purchaser believe that a product of a subsequent entrant is that of his better-known competitor." Defendants point to *Thompson*'s language that "palming off involve[s] active misrepresentation of the source of the product." *Thompson*, 1990-NMCA-012, ¶ 15. Defendants contend palming off does not apply to this situation, in which Black & Decker collaborated with and permitted its trademark licensee, Applica, to produce and sell goods using Black & Decker's trademark under Black & Decker's supervision and control. Defendants argue the mere presence of Black & Decker's trademark on the Coffeemaker and its packaging was not deceptive because a trademark does not represent that Black & Decker produced the Coffeemaker. Defendants thus contend they did not actively misrepresent the source of the Coffeemaker because neither the Coffeemaker nor its packaging affirmatively stated

---

contend the district court erroneously rejected as legally immaterial—we decline to do so. *See Blaze Constr. Co. v. Tax'n & Revenue Dep't*, 1994-NMSC-110, ¶ 24, 118 N.M. 647, 884 P.2d 803 ("It is well established that an appellate court will not find facts on appeal.").

that Black & Decker designed, manufactured, distributed, or warranted the Coffeemaker. We are unpersuaded.

**{24}**   *Thompson* is distinguishable in several respects. There, the plaintiff, a furniture designer and manufacturer, sued the owners of a business seeking to enjoin the owners from selling a line of furniture similar to the plaintiff's. *Id.* ¶¶ 1-2. The plaintiff alleged violation of common law copyright, unfair trade practices, and unfair competition. *Id.* ¶ 2. Although this Court discussed the UPA's applicability to the plaintiff's common law unfair competition claim and considered the language of Section 57-12-2(D)(1) and (2) in determining whether the business owners had misrepresented the source of the furniture, we ultimately determined the case did not involve a state claim of unfair competition. *Thompson*, 1990-NMCA-012, ¶¶ 11, 13-17, 22. This Court reasoned that the plaintiff sought protection against copying his furniture designs, and thus concluded that the plaintiff's claim was preempted by federal copyright law. *Id.* ¶ 22. The instant case, in contrast, does not involve a claim brought by a commercial competitor relating to copyright protections or unfair competition but rather a state UPA claim brought by a consumer relating to deceptive branding. *See Gandydancer*, 2019-NMSC-021, ¶ 20 (stating that, in removing certain references to "unfair methods of competition" from the UPA, the Legislature demonstrated "an intent to limit the zone of interest protected from unfair trade practices by the UPA to consumers, not competitors").

**{25}**   To the extent *Thompson* discusses Section 57-12-2(D)(2) of the UPA, one of the sections relied on by the district court in deciding the Pumas' name brand claim, *Thompson* is likewise distinguishable. There, this Court noted that, "to prove that a competitor created confusion, [the] plaintiff must show that the public was deceived as to the source of the product" but found "[t]here was no evidence to show that the public was actually deceived as to the source of the furniture." *Thompson*, 1990-NMCA-012, ¶¶ 14, 17. Here, by contrast, the district court made findings demonstrating that the Pumas were actually deceived as to the source of the Coffeemaker.

**{26}**   Even if we assume that, by virtue of the trademark licensing agreement between Applica and Black & Decker, Defendants' use of the Black & Decker trademark on the Coffeemaker could not alone constitute active misrepresentation as to the source or manufacturer of the Coffeemaker, Defendants have not adequately addressed the district court's reliance on Section 57-12-2(D)(14), which provides that "using . . . ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive" can constitute an unfair or deceptive trade practice. In other words, even if we assume Defendants' use of the Black & Decker trademark by itself did not actively misrepresent the Coffeemaker's source or manufacturer, Defendants do not address the ambiguity created by Defendants' use of the Black & Decker trademark together with the absence of any disclosure on the Coffeemaker, or in Wal-Mart's coffeemaker display section, which might indicate to a reasonable consumer either (1) the relationship between Black & Decker and Applica; or (2) that the Coffeemaker was in fact an Applica, rather than Black & Decker, product. *See Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-027, ¶ 15, 135 N.M. 265, 87 P.3d 545 ("The UPA . . . imposes a duty to disclose material facts reasonably necessary to prevent any statements from

being misleading."); *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 40, 142 N.M. 437, 166 P.3d 1091 ("[I]t appears that the duty to disclose only arises in relation to some other representation which would otherwise tend to mislead in the absence of the disclosure." (emphasis omitted)). *See generally* § 57-12-2(D)(14).

**{27}** Based on the district court's factual findings in this case, we cannot say the court erred in concluding that Defendants' knowing and willful use of ambiguity as to a material fact, which tended to deceive a reasonable consumer, constituted an unfair or deceptive trade practice as defined in Section 57-12-2(D)(14). Although Black & Decker has at all relevant times continued to produce and sell consumer products with the Black & Decker name and logo, Black & Decker did not design, manufacture, distribute, or warrant the Coffeemaker. The Coffeemaker and the box in which it was packaged, however, misleadingly stated that the Coffeemaker was a Black & Decker product even though it was an Applica product. A consumer reading the information on the box would not know of any relationship between Black & Decker and Applica. The name of the Coffeemaker as stated on the box—"Black & Decker 12 Cup Programmable Coffeemaker"—emphasized that the "Black & Decker" name was an important characteristic of the Coffeemaker; these statements tended to deceive a reasonable consumer, and Defendants knew or should have known that potential purchasers of the Coffeemaker would likely regard information about the Coffeemaker being a Black & Decker product as material. Accordingly, we conclude the district did not err in concluding Defendants' conduct constituted an unfair or deceptive trade practice under the UPA.

**{28}** We take a moment to emphasize what our decision does not conclude. We do not conclude that the use of a trademark by a licensee pursuant to a trademark licensing agreement by itself constitutes an unfair or deceptive trade practice. Nor do we conclude that evidence regarding the existence of a trademark licensing agreement or the widespread use of these agreements is per se irrelevant in determining whether the use of a trademark constitutes an unfair or deceptive trade practice. Finally, we do not conclude that evidence concerning the quality of a product marketed pursuant to a trademark licensing agreement is also per se irrelevant. Rather, our decision is limited to concluding that the district court was not required to apply Lanham Act precedent in ruling on the Pumas' UPA claim, and that, under the circumstances of this case, Defendants' knowing and willful use of ambiguity as to material fact, which tended to deceive a reasonable consumer, constituted an unfair or deceptive trade practice.

## II.   The District Court Did Not Err in Denying Damages for Unjust Enrichment

**{29}** In addition to their UPA branding claim, the Pumas brought a claim for unjust enrichment seeking to "disgorge all net benefits" Defendants had earned in connection with the Coffeemaker's sale. In denying the Pumas and class members damages for unjust enrichment, the district court concluded that the Pumas and the class had not met their burden of proof in establishing the amount of these damages. On cross-appeal, the Pumas contend the district court applied an improper burden, and that, even if the district court applied the proper burden, it was met. In addition, the Pumas argue

the district court's conclusions conflict with its findings of fact. We examine each argument in turn.

**{30}** "Whether the district court correctly allocated the burden of proof is a question of law that this Court reviews de novo." *Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶ 25, 304 P.3d 409. The Pumas argue the district court erred by applying the "reasonable approximation" standard set forth in Section 51 of the Restatement (Third) of Restitution and Unjust Enrichment (2011) (the Restatement). *See id.* § 51(5)(d) ("A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain."). The Pumas contend New Mexico has applied the traditional rule—that a plaintiff's burden is merely to provide evidence regarding a defendant's revenues from a tainted transaction while the defendant has the burden of proving any offset. *See id.* § 51 cmt. i ("A traditional formula . . . states that the claimant has the burden of proving revenues and the defendant has the burden of proving deductions.").

**{31}** "Disgorgement is an equitable remedy whereby a wrongdoer is forced to give up the benefits obtained as a result of his wrongdoing." *Peters Corp. v. N.M. Banquest Invs. Corp.*, 2008-NMSC-039, ¶ 32, 144 N.M. 434, 188 P.3d 1185; *see also Miller v. Bank of Am., N.A.*, 2015-NMSC-022, ¶ 23, 352 P.3d 1162 ("Disgorgement is not intended to compensate beneficiaries but to prevent unjust enrichment of the trustee and to deter that trustee and others from similar misconduct."). "[A] disgorgement award must be premised on wrongful conduct that results in a benefit to the defendant and extends only to the amount of gain the defendant derived from the prohibited conduct." *Miller*, 2015-NMSC-022, ¶ 25. "The remedy may not be used punitively, and thus a causal connection must exist between the breach and the benefit sought to be disgorged." *Peters Corp.*, 2008-NMSC-039, ¶ 32; *see id.* (recognizing that "[t]he touchstone of a disgorgement calculation is identifying a causal link between the illegal activity and the profit sought to be disgorged" and that "[t]he court's power to order disgorgement extends only to the amount by which the defendant profited from his wrongdoing" (omission, internal quotation marks, and citations omitted)).

**{32}** Our Supreme Court has indicated that the party seeking disgorgement has a burden to demonstrate a causal connection between the improper conduct and the benefits obtained. *See id.* ¶¶ 31, 34-35, 41 (concluding the district court did not abuse its discretion in refusing to order disgorgement where the plaintiff did not show a causal connection between the defendant's breach of fiduciary duty and the benefits obtained by the defendant). Likewise, the Restatement provides that "a claimant who is prepared to show a causal connection between [the] defendant's wrongdoing and a measurable increase in the defendant's net assets will satisfy the burden of proof as ordinarily understood." Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i. This Court has previously looked to the Restatement, together with *Peters*, in determining whether a plaintiff was entitled to an award of unjust enrichment. *See generally Martin v. Comcast Cablevision Corp. of Cal., LLC*, 2014-NMCA-114, ¶¶ 13-14, 338 P.3d 107. In light of the similarities between our case law and the Restatement, as well as this Court's previous willingness to look to the Restatement for guidance, we conclude the

district court did not err in relying on the reasonable approximation rather than the traditional rule. *See* Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i. (rejecting the traditional rule in which "the claimant has the burden of proving revenues and the defendant has the burden of proving deductions" in favor of "a more modern and generally useful rule that the claimant has the burden of producing evidence from which the court may make at least a reasonable approximation of the defendant's unjust enrichment"); *id.* ("Disgorgement does not impose a general forfeiture: [a] defendant's liability in restitution is not the whole of the gain from a tainted transaction, but the amount of the gain that is attributable to the underlying wrong.").

{33}    To the extent the Pumas contend New Mexico has consistently applied the traditional rule, the cases they cite address burdens related to mitigating damages, an affirmative defense, rather than disgorgement of unjust gains, and are therefore distinguishable. *See McGinnis v. Honeywell, Inc.*, 1990-NMSC-043, ¶ 22, 110 N.M. 1, 791 P.2d 452 (explaining that mitigation of damages "is an affirmative defense which the defendant must plead, and the burden of proof is on [the] defendant to minimize the damages" (internal quotation marks and citation omitted)); *Maese v. Garrett*, 2014-NMCA-072, ¶ 14, 329 P.3d 713 (stating that "[t]he burden of proving that a tortfeasor's negligence benefitted the plaintiff is generally the defendant's" and recognizing that proving the value of benefit conferred is considered in mitigation of damages).

{34}    The Pumas next argue that, even under the reasonable approximation standard, the class met its burden of producing evidence permitting a reasonable approximation of the amount of Applica's wrongful gain. The Pumas contend that their calculation of Applica's wrongful gain—based on the $5 per unit revenue Applica made on each Coffeemaker it sold to Wal-Mart[7]—constitutes a reasonable approximation. Based on the district court's factual findings, we disagree.

{35}    Importantly, the district court expressly rejected the Pumas' proposed finding that "[a] reasonable inference can be drawn, and is drawn by the [c]ourt as fact finder, that the reason Wal-Mart was willing to pay Applica $5 more than Applica paid for each Coffeemaker . . . was that Applica had the exclusive right to market the Coffeemaker as a Black & Decker product." *See Jones v. Beavers*, 1993-NMCA-100, ¶ 18, 116 N.M. 634, 866 P.2d 362 (explaining that "[t]he [district] court's refusal to adopt the requested findings of fact is tantamount to a finding against [the requesting party] on each of these factual issues"); *see also State ex rel. King v. UU Bar Ranch Ltd. P'ship*, 2009-NMSC-010, ¶ 44, 145 N.M. 769, 205 P.3d 816 ("When a [district] court rejects proposed findings of facts or conclusions of law, we assume that said facts were not supported by sufficient evidence.").

{36}    Additional findings of fact addressing the Pumas' expert's calculation of Applica's wrongful gain based on the entire $5 per unit revenue from the sale of each Coffeemaker to Wal-Mart further undermine the Pumas' contention that they produced

---

[7]The $5 amount identified by the Pumas is measured by the difference between the price Wal-Mart paid Applica for each Coffeemaker ($14.75) and the price Applica paid its manufacturer to build, package, and deliver each unit to Applica's warehouse ($9.75).

evidence permitting a reasonable approximation of the amount of Applica's wrongful gain. The Pumas' expert admitted that a transaction can have just and unjust components. The expert's unjust enrichment calculation nonetheless failed to "account for the profit associated with [the Coffeemaker's] features," and the expert "ha[d] no opinion as to the value of the features that the purchasers of the . . . [C]offeemaker received." Rather, the expert's calculation was "based on an assumption that the entirety of the various transactions that resulted in a consumer purchasing [the C]offeemaker from Wal-Mart were unjust." The Pumas' expert "made *no effort* to disaggregate the profit generated from the lawful aspects of the transaction from those aspects of the transaction that [the Pumas] allege are wrongful." (Emphasis added.) In light of these factual findings, we cannot conclude that the Pumas met their burden of "producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain." *See* Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d).[8]

**{37}**     The Pumas, however, urge us to look to different factual findings that they contend contradict the district court's conclusion that the Pumas and class failed to meet their burden in establishing the amount Applica and Black & Decker were unjustly enriched. With regard to Applica, the Pumas point out that the district court found that "[c]onsumers are willing to pay a higher price for a name brand coffeemaker, such as the [Coffeemaker], than they would pay for a generic coffeemaker of equal quality." The Pumas also point to the district court's findings that Applica sold each Coffeemaker to Wal-Mart for $5 more than it cost to manufacture despite "add[ing] nothing of value to the Coffeemakers other than Applica's exclusive ability to market the Coffeemakers as a Black & Decker product," as the Coffeemakers "were already built and packaged when they reached Applica's place of business in California." The Pumas argue these findings equate to a finding that Applica was able to add $5 per unit to the purchase price of each Coffeemaker "based entirely" on its ability to market the Coffeemakers as a Black & Decker product. These findings, the Pumas contend, contradict the district court's conclusion that the Pumas failed to "offer any evidence-based theory for why all 'per unit profit' is attributable to the use of the Black & Decker brand."

**{38}**     "We construe findings to uphold, rather than defeat, a judgment." *Jaramillo v. Gonzales*, 2002-NMCA-072, ¶ 31, 132 N.M. 459, 50 P.3d 554. The findings discussed above—for example, that the Pumas' expert admitted that a transaction can have just and unjust components, based his opinions on the assumption that the entirety of the

---

8Our conclusion does not foreclose the possibility that an approximation of a defendant's wrongful gain based on "the whole gain from a tainted transaction" could be reasonable, when, for example, the evidence allows no greater precision. *See* Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i. (stating that a reasonable approximation "will suffice to establish the disgorgement liability of a conscious wrongdoer, when the evidence allows no greater precision, because the conscious wrongdoer bears the risk of uncertainty arising from the wrong"); *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006) ("Of course, the reasonableness of an approximation varies with the degree of precision possible."). In this case, however, the Pumas have not developed an argument on cross-appeal that the evidence allowed no greater precision than a calculation based on Applica's revenue from each Coffeemaker sold or that they were unable through discovery to gather evidence allowing a more precise approximation of the amount of Applica's wrongful gain.

various transactions that resulted in a consumer purchasing the Coffeemaker were unjust, and made "no effort" to disaggregate the profit generated from the lawful aspects of the transaction from those aspects of the transaction that the Pumas allege are wrongful—support the district court's conclusion. In addition, the Pumas overlook the district court's finding that the Coffeemaker's manufacturer "built and packaged the Coffeemaker *pursuant to Applica's specifications*"—which indicates that Applica added value *apart* from the Coffeemaker's assembly and packaging. (Emphasis added.) But even if we were to conclude that Applica added no value whatsoever to the Coffeemaker—acting strictly as an intermediary connecting a product to a retailer—this would not foreclose Applica itself from profiting by selling the Coffeemaker to Wal-Mart at a mark-up. Accordingly, we cannot not say the district court's findings contradict its conclusion with regard to Applica.

**{39}**   As to Black & Decker, the Pumas likewise contend that the district court's conclusions of law conflict with its findings of fact. The Pumas point to the district court's findings summarizing the Pumas' expert's calculation of Black & Decker's unjust enrichment—all royalties Black & Decker received from Applica pursuant to the trademark licensing agreement from sales of the Coffeemaker. The Pumas contend that it is necessarily the case that all royalties received by Black & Decker from Applica for the use of the Black & Decker name in selling the Coffeemaker are wrongful, in line with their calculation.

**{40}**   As discussed, the district court found that the expert's opinions were based on the assumption that "the entirety of the various transactions that resulted in a consumer purchasing [the C]offeemaker from Wal-Mart were unjust" and "made no effort to disaggregate the profit generated from the lawful aspects of the transaction from those aspects of the transaction that [the Pumas] allege[d were] wrongful." Again we reiterate that the Pumas' own expert conceded that it was possible for a transaction to have a just and unjust component to it. Construing the district court's findings to uphold rather than defeat its judgment, we cannot say that its findings, taken together, contradict its conclusion. *See Normand ex rel. Normand v. Ray*, 1990-NMSC-006, ¶ 35, 109 N.M. 403, 785 P.2d 743 ("Findings of fact are to be liberally construed so as to uphold the judgment of the [district] court.").[9]

### III.   Attorney Fees

**{41}**   Finally, Defendants argue that, as a matter of law, the Pumas were not entitled to attorney fees incurred for (1) certifying the class, (2) pursuing their 12-cup theory, (3) establishing actual damages, and (4) entries of "block" billing. Defendants further argue that the district court erred in applying the 1.5 multiplier to the Pumas' award.

---

[9]As the class request for attorney fees in connection with this cross-appeal is premised on their entitlement to unjust enrichment damages, we need not reach this issue. *See Crutchfield v. N.M. Dep't of Tax'n & Revenue*, 2005-NMCA-022, ¶ 36, 137 N.M. 26, 106 P.3d 1273 ("A reviewing court generally does not decide academic or moot questions.").

**{42}** "We review an award of attorney[] fees for abuse of discretion." *Cobb v. Gammon*, 2017-NMCA-022, ¶ 60, 389 P.3d 1058; *see also Garcia v. Jeantette*, 2004-NMCA-004, ¶ 15, 134 N.M. 776, 82 P.3d 947 ("The decision whether to grant or deny a request for attorney fees rests within the sound discretion of the district court."). The district court abuses its discretion when "a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. "[A] discretionary decision based on a misapprehension of the law is an abuse of discretion that must be reviewed de novo." *Rio Grande Sun v. Jemez Mountains Pub. Sch. Dist.*, 2012-NMCA-091, ¶ 10, 287 P.3d 318 (internal quotation marks and citation omitted).

**{43}** "[I]t has long been the rule in New Mexico that a party is only entitled to those fees resulting from the cause of action for which there is authority to award attorney fees." *Dean v. Brizuela*, 2010-NMCA-076, ¶ 16, 148 N.M. 548, 238 P.3d 917. "Our Supreme Court has continued to direct that recoverable fees be segregated from non-recoverable fees to ensure that only those fees for which there is authority to award attorney fees are in fact awarded." *Id.* ¶ 17; *see also J.R. Hale Contracting Co. v. Union Pac. R.R.*, 2008-NMCA-037, ¶¶ 92, 95, 143 N.M. 574, 179 P.3d 579 (stating that an award of attorney fees under a statutory claim, which allows an award for attorney fees that is joined with nonstatutory claims, must be limited to the work done on the statutory claim). This Court has recognized that in some cases it may be difficult or impossible to segregate the work performed on different claims because the work is "inextricably intertwined." *J.R. Hale Contracting Co.*, 2008-NMCA-037, ¶ 95 (internal quotation marks and citation omitted). However, our Supreme Court has emphasized that, notwithstanding that some work may be intertwined, "the [district] court should attempt to distinguish between the two types of work to the extent possible." *Hinkle, Cox, Eaton, Coffield & Hensley v. Cadle Co. of Ohio, Inc.*, 1993-NMSC-010, ¶ 32, 115 N.M. 152, 848 P.2d 1079.

**{44}** Under the UPA, "[t]he court shall award attorney fees and costs to the party complaining of an unfair or deceptive trade practice or unconscionable trade practice if the party prevails." Section 57-12-10(C). "When a plaintiff asserts a UPA claim along with a number of other distinct claims, the [district] court must separate the claims and determine the amount of time spent on each." *Chavarria v. Fleetwood Retail Corp. of N.M.*, 2005-NMCA-082, ¶ 43, 137 N.M. 783, 115 P.3d 799 (internal quotation marks and citation omitted), *aff'd in part, rev'd in part on other grounds*, 2006-NMSC-046, ¶ 42, 140 N.M. 478, 143 P.3d 717.

**{45}** The district court used the "lodestar" method to arrive at a determination for attorney fees. To calculate the lodestar value, "the court determines a fee that approximates a reasonable hourly rate multiplied by the number of hours reasonably incurred in the representation." *Atherton v. Gopin*, 2012-NMCA-023, ¶ 7, 272 P.3d 700. "The lodestar provides an objective basis for valuing the attorney's services." *Rio Grande Sun*, 2012-NMCA-091, ¶ 20 (alteration, internal quotation marks, and citation omitted). "An award based on a lodestar may be increased by a multiplier if the [district] court finds that a greater fee is more reasonable after the court considers the risk factor

and the results obtained." *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 34, 140 N.M. 879, 149 P.3d 976.

**{46}**   As we have addressed above, the Pumas prevailed on only one of their claims, their UPA name brand claim, whereas the class members were not prevailing parties and they were not entitled to attorney fees. Notwithstanding their failure to prevail on most of their claims, the Pumas requested a lodestar amount of $1,170,332.50 representing the fees billed for the entire case and a 2.0 multiplier. Defendants objected to the hours claimed by the Pumas as the basis for their fees and argued for a significant reduction. After a hearing on the motion, the district court awarded a lodestar that represented a reduction of the amount of hours requested by the Pumas, but not as much as Defendants argued was appropriate. Further, the district court applied a multiplier of 1.5 to the lodestar.

**{47}**   Defendants raise a number of objections to the fee award and we address their arguments in turn.

**A.      The District Court's Award to the Pumas of Attorney Fees Accrued for Certification Was an Abuse of Discretion**

**{48}**   Defendants' first argument regarding attorney fees is that, because the class members are not prevailing parties, the Pumas cannot recover fees expended on class-related issues. As we explain, we agree that it was a misapprehension of the law and thus an abuse of discretion to award the Pumas fees for class-related work.

**{49}**   Per the UPA, the prevailing party is entitled to reasonable attorney fees. *See* § 57-12-10(C); *Jones v. Gen. Motors Corp.*, 1998-NMCA-020, ¶ 24, 124 N.M. 606, 953 P.2d 1104 (noting that because the plaintiff established that the defendant violated the UPA, he was "entitled to reasonable attorney[] fees and costs in this action"). Defendants' challenge is to the fees incurred by the Pumas for work related to the certification of the class. We note that "an attorney is required . . . to perform all services required in the *interest of* [*their*] *client* and reasonably to be contemplated at the inception of the contract of employment." *In re Brown's Est.*, 1944-NMSC-066, ¶ 19, 48 N.M. 580, 154 P.2d 247 (emphasis added). Thus, the question before us is whether the fees incurred for class-related work were reasonably necessary or if they provided actual benefit for the Pumas to prevail in their UPA claim against Defendants. *See Calderon v. Navarette*, 1990-NMSC-098, ¶ 13, 111 N.M. 1, 800 P.2d 1058 ("The district court should award a fee based upon the benefits actually provided to the client."); *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (noting that in assessing a reasonable attorney fee "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or *otherwise unnecessary*" (emphasis added)). We cannot say that the fees related to certification were reasonably necessary for the Pumas to prevail on their UPA claim given that the class members' claims ultimately failed.

**{50}**    The Pumas' prevailing cause of action was based on their UPA name brand claim in which they established that Defendants engaged in an unfair trade practice. Though we afford deference to the district court in its determination of attorney fees, the district court provided no explanation of why attorney fees incurred on the basis of certification were reasonable, how they were related to the Pumas' prevailing claim, or in what way they benefitted the Pumas. We cannot say based on the record before us and the arguments and evidence set forth by the parties that certifying the class was necessary for the Pumas to prevail on their cause of action. The evidence and legal services required to prove certification did not affect the Pumas' ability to prove Defendants violated the UPA based on their name brand theory. "While the fee agreement provided for a reasonable fee for the services to be performed, even a minimal fee becomes excessive when no service is provided." *In re Roberts-Hohl*, 1994-NMSC-004, ¶ 12, 116 N.M. 700, 866 P.2d 1167.

**{51}**    The Pumas argue that the test articulated in *O'Neal v. City of Seattle*, 66 F.3d 1064 (9th Cir. 1995), permits them to recover the fees associated with certification. However, the test set out in *O'Neal* is based on award of attorney fees for federal civil rights claims. *Id.* at 1068-69. The test permits a fee award for unsuccessful claims if they are related to successful claims based on the success of the results obtained. *Id.* Although our courts have followed some federal case law regarding civil rights claims in regard to New Mexico causes of actions, *see Gonzales v. N.M. Dep't of Health*, 2000-NMSC-029, ¶ 35, 129 N.M. 586, 11 P.3d 550 (New Mexico Human Rights Act); *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 28 (class action settlement agreement); *Cnty. of Bernalillo v. Sisneros*, 1994-NMCA-156, ¶¶ 1, 18, 119 N.M. 98, 888 P.2d 980 (Workers' Compensation Act), we have not adopted the prevailing-party test used for civil rights claims—wherein fees may be awarded for unsuccessful claims—for claims under the UPA. We decline to do so in the face of our case law that determines a party is only entitled to fees for which there is statutory authority, and the statutory authority here awards fees to the prevailing party. *See J.R. Hale Contracting Co.*, 2008-NMCA-037, ¶¶ 92, 95; § 57-12-10(C).

**{52}**    While we agree with the Pumas that "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Berry v. Fed. Kemper Life Assurance Co.*, 2004-NMCA-116, ¶ 50, 136 N.M. 454, 99 P.3d 1166 (internal quotation marks and citation omitted), that does not change our analysis. The work can be related but still not *benefit* the Pumas. *See Calderon*, 1990-NMSC-098, ¶ 10. Because the Pumas did not benefit from the work related to certification and the work was not reasonably necessary for the Pumas to prevail in their claim, it was an abuse of discretion to award the Pumas attorney fees related to certification. *See Harrison v. Bd. of Regents of Univ. of N.M.*, 2013-NMCA-105, ¶ 14, 311 P.3d 1236 ("[Appellate courts] may characterize as an abuse of discretion a discretionary decision that is premised on a misapprehension of the law." (internal quotation marks and citation omitted)).

**B.    The Remainder of the District Court's Decision Regarding Attorney Fees Does Not Constitute an Abuse of Discretion**

**{53}** Defendants next request that we examine the district court's individual fee awards and determine that each award was erroneous because the Pumas are not entitled to attorney fees expended on (1) their "12-cup" theory, (2) establishing actual damages, and (3) entries of "block billing."

**{54}** In addressing Defendants' arguments, we are guided by the following principles. "The appellate court presumes that the district court is correct, and the burden is on the appellant to clearly demonstrate that the district court erred." *Corona*, 2014-NMCA-071, ¶ 26. Further, "'abuse of discretion'—already one of the most deferential standards of review—takes on special significance when a court is reviewing fee decisions. The district court, which is intimately familiar with the nuances of the case, is in a far better position to make such decisions than is an appellate court, which must work from a cold record." *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 14 (alterations, internal quotation marks, and citation omitted). "This court is not inclined to second-guess the [district court] in [its] determination as to the reasonableness of an award of attorney[] fees unless there is a lack of evidentiary basis for the court's determination or unless the court has been shown to have clearly abused its discretion." *Schall v. Schall*, 1982-NMCA-045, ¶ 40, 97 N.M. 665, 642 P.2d 1124. Our duty is to defer to the district court and not disturb an award of attorney fees unless the award is "patently erroneous." *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 6.

**{55}** Upon review of the total award, we observe that the district court reduced the award requested by the Pumas significantly. The district court stated that in awarding fees, it was not awarding fees that went to the 12-cup claim and could be segregated out, thereby acknowledging the Pumas could not recover attorney fees relating to that claim. The district court also noted that the costs related to the Pumas' expert witness were essential to the Pumas' ability to go forward with their case. We can infer that based on this that the district court reasonably assessed Defendants' arguments regarding actual damages. *See Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 65, 146 N.M. 853, 215 P.3d 791 ("Upon a doubtful or deficient record, every presumption is indulged in favor of the correctness and regularity of the [district] court's decision, and the appellate court will indulge in reasonable presumptions in support of the order entered." (internal quotation marks and citation omitted)). Defendants have not convinced us that the district court's reductions failed to consider the issues they have identified. Based on the district court's explanation of its award and the significant decrease in the award, we conclude that the remainder of the lodestar award for the Pumas' attorney fees was not an abuse of discretion. *See Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 1990-NMSC-100, ¶ 8, 111 N.M. 6, 800 P.2d 1063 ("The presumption upon review favors the correctness of the [district] court's actions. [The a]ppellant must affirmatively demonstrate its assertion of error.").

## C. The Multiplier Awarded Was Not an Abuse of Discretion

**{56}** Defendants' final argument is that the district court's award of a 1.5 multiplier to the lodestar amount for attorney fees was an abuse of discretion. Defendants argue that

the district court abused its discretion in considering the "time value of money" when applying the multiplier.

**{57}** This Court has determined that the use of a multiplier is permitted when awarding attorney fees pursuant to the UPA, and it is within the district court's discretion to apply such a multiplier. *Atherton*, 2012-NMCA-023, ¶ 9. "An award based on a lodestar may be increased by a multiplier if the [district] court finds that a greater fee is more reasonable after the court considers the risk factor and the results obtained." *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 34. "[T]o the extent that the lodestar rate does not take into account the factors that justify a multiplier, the district court has discretion to apply a multiplier in a UPA case." *Atherton*, 2012-NMCA-023, ¶ 11.

**{58}** Defendants cite only *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010), to support the assertion that the district court abused its discretion in applying the multiplier to the lodestar. However, as the Pumas note, *Perdue* relates to civil rights claims, and we determined in *Atherton* that we need not be bound by federal fee-shifting cases, including *Perdue*, when assessing if a multiplier is appropriate. *Atherton*, 2012-NMCA-023, ¶¶ 10, 11.

**{59}** In addressing the multiplier, the district court noted that it considered risk, the policy of providing incentives to attorneys to take cases that enforce a public good, and the success obtained. In part, the district court applied a lower multiplier than the Pumas requested after assessing the relative success of the parties. Based on the evidence presented and the district court's explanation of its award, we cannot say that applying a 1.5 multiplier was against the "logic and effect of the facts and circumstances before the court." *See In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 6 (internal quotation marks and citation omitted).

## CONCLUSION

**{60}** We reverse the district court's decision to award the Pumas attorney fees related to class certification and remand for recalculation of the attorney fees award without inclusion of those fees, and for calculation of the Pumas' reasonable attorney fees and costs of this appeal, *see Atherton*, 2012-NMCA-023, ¶ 16 (providing attorney fees and costs for the prevailing party for a UPA claim on appeal), but otherwise affirm.

**{61}  IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation**